The **MARTIN LANE COMPANY, Inc.**

v.

The **UNITED STATES.**

No. 40–69.

United States Court of Claims.

Oct. 16, 1970.

sion of time to August 10, 1970 to file a request for review by the court of the commissioner's opinion, which motion was allowed on July 17, 1970. However, no request for review has been filed by either party and the times for so filing under the Rules of the court and the extension granted have expired. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth without oral argument. Therefore, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and plaintiff's petition is dismissed. Defendant's counterclaim is also dismissed.

Samuel F. Schwag, Philadelphia, Pa., attorney of record, for plaintiff.

Steven L. Cohen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case was referred to Trial Commissioner Harry E. Wood with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on June 4, 1970, wherein such facts as are necessary to the opinion are set forth. The plaintiff filed a motion for an exten-

## OPINION OF COMMISSIONER

WOOD, Commissioner: This case is before the court on cross-motions for summary judgment for review, under Wunderlich Act [1] standards, of a decision of the Armed Services Board of Contract Appeals denying plaintiff's claim for an equitable adjustment for an alleged constructive change.[2] It arises out of a 1966 contract (DSA 100–3183) between plaintiff and defendant (acting through the Defense Personnel Support Center, Defense Supply Agency), for the manufacture and delivery of 14,060 units of "Armor Groin Class I, Various Sizes."

Throughout (and for some time after) the "bidding" which led to the negotiated contract in suit, plaintiff interpreted defendant's "bid package" [3] to mean that each of the "Waist" sizes of Class 1 groin armor called for (designated 28, 30, 32, 34, 36, 38, 40, and 42) would be manufactured from a "pattern size" bearing a like number. After contract award, however, plaintiff discovered that under defendant's interpretation of the contract documents, Class 1 groin armor

---

1. 68 Stat. 81, 41 U.S.C. §§ 321–22 (1964).

2. ASBCA No. 11741, 68–2 BCA ¶ 7373.

3. The "bid package" included defendant's February 15, 1966, Request for Proposals; Amendment No. 1 thereto, dated February 18, 1966; Specification MIL–A–43366, dated September 16, 1965; and a pattern roll "Armor Body Fragmentation Protective, MIL–A–43366, All Sizes", also dated September 16, 1965.

"Waist" sizes designated 28 through 42 were to be fabricated from *pattern* sizes 36 through 50, respectively.

At about the same time, defendant learned of plaintiff's differing interpretation. In consequence, plaintiff was duly directed to manufacture the groin armor in accordance with defendant's view of the contract requirements. In rejecting plaintiff's claim for an equitable adjustment for the alleged "change", the Board concluded that plaintiff's interpretation of the contract "is unreasonable and cannot be upheld."

The administrative decision involved the interpretation of the contract, and was therefore "on a question of law", within the meaning of Section 2 of the Wunderlich Act, 68 Stat. 81, 41 U.S.C. § 322 (1964). Thus, it is neither entitled to finality thereunder nor binding on this court. Mountain Home Contractors v. United States, 425 F.2d 1260, 192 Ct.Cl. 16 (1970); Gorn Corp. v. United States, 424 F.2d 588, 191 Ct.Cl. 560 (1970).

Plaintiff, seeking to invoke the "oft-repeated and much-applied rule"[4] that where "some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted * * *",[5] contends that the Board's conclusion is erroneous as a matter of law. Nor, plaintiff says, was it under any duty to seek clarification.[6]

Defendant argues that plaintiff's interpretation is unreasonable, and that, in any event, there was such "a major inconsistency * * * between plaintiff's interpretation and the specifications" as to impose "a duty to make inquiry of the contracting officer or another appropriate Government official." Defendant also asserts a counterclaim for $4,116.57, alleged to be due it under the facts and circumstances of this case.

For reasons hereinafter appearing, it is concluded (1) that plaintiff is not entitled to recover on its claim for an equitable adjustment, and (2) that defendant is not entitled to recover on its counterclaim.

The facts relevant to plaintiff's claim are essentially undisputed. On February 15, 1966, the Defense Supply Agency issued a Request for Proposals ("RFP") for the manufacture of 14,060 units of "Armor Groin Class I, Various Sizes", to be produced in accordance with Military Specification MIL–A–43366, dated September 16, 1965 (hereinafter "Specification MIL–A–43366"), from government-furnished patterns bearing the same date. On receipt of the RFP, Specification MIL–A–43366, and the aforementioned pattern roll, plaintiff noted that, although the RFP contained the Federal Stock Number (FSN) for each of the several sizes of groin armor involved, and the quantity desired for each item (as represented by the FSN), it omitted any indication of sizes.

Plaintiff orally notified DSA of the omission, and, by Amendment No. 1 to the RFP, issued February 18, 1966, each Class 1 size designation was correlated with an FSN (and quantity) contained in the RFP.[7] The relevant portion of Amendment No. 1 is as follows:

Page 5 of Request for Proposal under Delivery Schedule add the following

---

4. Sturm v. United States, 421 F.2d 723, 727, 190 Ct.Cl. 691, 697 (1970).

5. WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963).

6. See Mountain Home Contractors v. United States, *supra*; J. A. Jones Constr. Co. v. United States, 395 F.2d 783, 789–791, 184 Ct.Cl. 1, 11–15 (1968), and cases there cited.

7. Quantities for each size designation were:

| Size | Quantity |
|---|---|
| 28 | 290 |
| 30 | 830 |
| 32 | 1,430 |
| 34 | 2,550 |
| 36 | 4,870 |
| 38 | 1,710 |
| 40 | 1,980 |
| 42 | 400 |
| Total All Sizes | 14,060 |

size designation with its corresponding Federal Stock Number.

| 8470–753–6110 | 8470–753–6114 |
|---|---|
| Size 28 | Size 36 |
| 8470–753–6111 | 8470–753–6115 |
| Size 30 | Size 38 |
| 8470–753–6112 | 8470–753–6116 |
| Size 32 | Size 40 |
| 8470–753–6113 | 8470–753–6117 |
| Size 34 | Size 42 |

Although defendant was to furnish the material for the groin armor at a stated cost per yard, each bidder was solely responsible for determining the amount it would require for contract performance. The RFP provided that the estimated unit value of government-furnished material would be deducted from the contract price and applied to the value of material furnished by the government. Because a bidder's material usage estimate was thus a competitive factor in contract award, size designations were essential to bid preparation.

The relevant portions of Specification MIL–A–43366 are: 1.2 Classification. —Groin armor shall be of one type and two classes in the following sizes (see 6.2):

| Pattern Size | Class 1 Army Groin Protector (Waist) | Class 2 Navy Groin Protector (Waist) |
|---|---|---|
| 36 | 28 | 36 |
| 38 | 30 | 38 |
| 40 | 32 | 40 |
| 42 | 34 | 42 |
| 44 | 36 | 44 |
| 46 | 38 | 46 |
| 48 | 40 | 48 |
| 50 | 42 | 50 |

[A2992]

\* \* \* \* \* \*

3.7 Measurements.—The finished groin armor shall conform to the measurements in table II. Circumference measurements shall be taken with slide fastener in the closed position and with the item lying flat on the table.

Table II.—Measurements (inches)

| Pattern size | Back length (±¼) | Side length (±¼) | Front length (±½) | Outer Waist Circumference (±½) |
|---|---|---|---|---|
| 36 | 14 | 5½ | 12 | 35 |
| 38 | 14 | 5½ | 12 | 37 |
| 40 | 14 | 5½ | 12 | 39 |
| 42 | 14 | 5½ | 12 | 41 |
| 44 | 14 | 5½ | 12 | 43 |
| 46 | 14 | 5½ | 12 | 45 |
| 48 | 14 | 5½ | 12 | 47 |
| 50 | 14 | 5½ | 12 | 49 |

[A2993]

\* \* \* \* \* \*

6.2 Ordering data.—Procurement documents should specify the following:

(a) Title, number and date of this specification.

(b) Class and size desired (see 1.2).

\* \* \* \* \* \*

The pattern roll furnished to plaintiff prior to submission of its bid consisted of a single roll of paper containing pattern tracings. At the beginning of the roll appeared this legend:

Armor Body Fragmentation Protective
MIL–A–43366
All Sizes

There was also a notation, stamped in ink and repeated three times, across the head of the roll:

COMPLETE SET
ALL SIZES

As the pattern roll was opened, the following legends appeared in the order shown, before and after each pattern tracing:

Size 44 Class–1–Army Class–2–Navy
\* \* \*
Size 40 Class–1–Army Class–2–Navy
\* \* \*
Size 46 Class–1–Army Class–2–Navy
\* \* \*
Size 36 Class–1–Army Class–2–Navy
\* \* \*
Size 48 Class–1–Army Class–2–Navy
\* \* \*
Size 38 Class–1–Army Class–2–Navy
\* \* \*
Size 42 Class–1–Army Class–2–Navy
\* \* \*
Size 50 Class–1–Army Class–2–Navy
\* \* \*

Plaintiff's president and its general manager shared responsibility for reviewing these materials for plaintiff, and collaborated in the preparation of plaintiff's bid on the contract in suit.

As plaintiff's brief in support of motion for summary judgment puts it,

In structuring its bid, plaintiff, in examining Amendment 1 to the Request and the Specification, concluded the requirement to be that defendant wished to procure groin in the sizes as stated in the bid [sic]. [Both plaintiff's president and its general manager] joined in the interpretation that since the bid specified Class I sizes 28 through 42 and since the middle column of 1.2 of the specifications correlated exactly with this requirement, the Government would issue patterns which would yield those sizes, specifically characterized as "waist" under the Class I column. No other sized patterns could possibly produce waists of those sizes * * *.

The administrative record buttresses, and illuminates, the factual elements of this summary. According to plaintiff's president, he noted from Amendment No. 1 that defendant desired groin armor, sizes 28 through 42. He then turned to paragraph 1.2, Specification MIL-A-43366, which reads in part that: "Groin armor shall be of one type and two classes in the following sizes (see 6.2)." At this point, he testified, "Of course, I immediately went to paragraph 6.2, * * entitled 'Ordering Date' [sic], and indicates that procurement documents should specify the following, * * * class and size desired * * * (see 1.2)."

Plaintiff's president also testified that the procurement documents (as he understood them, the RFP and Amendment No. 1) did specify "the class and the size", as "paragraph 6.2 has indicated * * *." He then described plaintiff's interpretation of the table in paragraph 1.2 (to which paragraph 6.2 referred) as follows:

Well, procurement document indicates Class 1, and on page 1 of the specification there is only one column,

entitled Class 1, and my attention was directed to this column, which is the middle column. It's called 'Class 1, Army Groin Protector, and below that in parenthesis '(Waist).' And below that sizes that correspond to the sizes required by the request for proposal and the amendment to the request for proposal.

As to Columns 1 and 3 of the table in paragraph 1.2, he testified that:

In looking over these three columns, in light of my procurement documents which specified sizes 28 through 42, the only place I find 28 through 42 is under Class 1. Now, under the column 'pattern size' I see numerical numbers from 36 going up to 50. They start at 36 and go up to 50 under Class 2. My first recollection would be pattern size and this last column somehow jib together; they had the same numerical notations, one to the other, but Class 1 column had the notations that corresponded to my procurement document, so again that's where my attention came to rest.

In computing its estimated material usage for bid preparation, plaintiff carried forward the interpretation indicated above, deciding that the median or average size called for by the RFP was the size designated 36.[8] To arrive at the amount of material required for a Class 1 groin armor unit designated size 36, plaintiff used the *pattern size 36* tracing in the pattern roll. Plaintiff's president unrolled the pattern roll to that pattern size without noting particularly what sizes were in the roll, determined estimated unit material usage from pattern size 36, and multiplied that amount of material by the number of units included in the RFP.

Plaintiff's president and its general manager admittedly did not read all of the provisions of Specification MIL-A-

8. The administrative record reflects that both plaintiff and defendant utilized a "median" size technique for estimating material usage on the contract in suit. The nub of this case is that defendant's median size was pattern size 44, while plaintiff's was pattern size 36. Plaintiff thus underestimated the material required to manufacture the groin armor in accordance with defendant's interpretation of the contract.

43366 prior to responding to the RFP. Again quoting from plaintiff's brief in support of its motion for summary judgment,

Plaintiff read the specifications carefully as regards those provisions which would affect its bid construction but read only the headings of those provisions which were not relevant, or were not related to bidding, or only related to completed items, *as for example par. 3.7* (Emphasis added).

In considering paragraph 1.2, "it only went so far as to matching the [first and third] columns [captioned "Pattern Size" and "Class 2 Navy Groin Protector (Waist)," respectively] up and then forgetting about them. * * * I wasn't bothered by Class 2. I was concerned with Class 1." Nor, as indicated heretofore, did plaintiff examine the entire pattern roll. While plaintiff was aware that pattern size 36 bore the notation "Size 36 Class–1–Army Class–2–Navy", the "Class–2–Navy" part of the legend was deemed of no relevance or materiality.[9]

Plaintiff's proposal, accepted March 17, 1966, consisted of a cut-make-and-trim (CMT) price of $8.11 per unit, a government-furnished material value (estimated) of $13.14 per unit, and a total unit cost of $21.25. These components, applied to the 14,060 units of groin armor, resulted in the following totals:

Total amount allotted to CMT cost . . . . . $114,026.60
Total government-furnished material value  184,748.40
    Total contract amount . . . . . . . . . . $298,775.00

About a week after contract award, plaintiff realized that the pattern roll contained no pattern sizes 28, 30, 32 and 34. Plaintiff called DSA and was told that if any patterns were missing they would be supplied. On April 1, 1966, having heard nothing from DSA, plaintiff made another phone call and sent DSA a letter. On April 19, 1966, still having no response, plaintiff made a third phone call to DSA.

At that time, plaintiff learned that defendant was interpreting the contract to require that Class 1 groin armor, "Waist" sizes designated 28 through 42, be cut from pattern sizes 36 through 50, respectively, and that the pattern roll sent with the bid package was complete. Plaintiff was also then informed that an interim amendment to Specification MIL–A–43366 had been issued February 10, 1966, five days prior to issuance of the Request for Proposals. Plaintiff was not furnished this amendment prior to bid submission, nor was it incorporated into or referenced in the contract. The relevant portions of the February 10, 1966, amendment are:

Page 1, paragraph 1.2—In first line, delete "and two classes". In second column heading, delete "Class 1". In third column heading, delete "Class 2".

Page 4, paragraph 3.2.8.1—Add the following sentence: "The size designation shall include both the Army size designation and the Navy size designation in accordance with 1.2, e. g. Size 28 (Army) 36 (Navy)".

On April 22, 1966, representatives of plaintiff and DSA met, at plaintiff's request, to discuss the matter. Each adhered to its prior view as to how the contract should be interpreted. Defendant thereupon directed plaintiff to continue production in accordance with defendant's interpretation.

By April 22, 1966, plaintiff had cut 2,336 fillers and 4,900 outer shells from pattern size 36. Under defendant's interpretation of the contract, only 290 units of groin armor designated "Waist" size 28 were required. To mitigate plaintiff's loss, the contracting officer and plaintiff agreed to defendant's pur-

9. Plaintiff's president testified that "in seeking the pattern that I was looking for, I was looking for the 36, Class 1 pattern, which I found." He saw that pattern size 36 bore "Class-1-Army Class-2-Navy" markings, but "simply dismissed Class 2."

chase of an additional 1,870 units designated size 28, at an increase of $39,737.-50 in the contract price, with acceleration of deliveries of such units.[10] The agreement (Contract Modification No. 2), dated April 29, 1966, is set forth in Appendix A.

On the foregoing facts, essentially if not entirely undisputed,[11] the Board decided that plaintiff's "interpretation of the RFP, based as it was on a partial or selective consideration of the materials included therein, is unreasonable and cannot be upheld." Underlying this holding was the conclusion that paragraph 1.2, Specification MIL–A–43366, indicated clearly that the pattern sizes (36 through 50) listed in Column 1 of paragraph 1.2 applied to both Class 1 Army and Class 2 Navy groin armor, listed in Columns 2 and 3 respectively.

That conclusion, the Board stated, was fortified by paragraph 3.7, "Measurements", listing only pattern sizes 36 through 50; by the "All Sizes", complete, pattern roll containing only pattern sizes 36 through 50; and by the fact that "pattern size 36" (and all other pattern sizes in the pattern roll) bore the legend "Class–1–Army Class–2–Navy." This latter consideration, the Board said, would "tend to confirm beyond any reasonable doubt the correlation in paragraph 1.2 between the various pattern sizes and the respective waist designations in the Class 1 and Class 2 columns."

■ The issue herein is not to be "resolved by the subjective test of whether or not the plaintiff was in fact misled, and did in fact suffer a loss, but rather by the objective test of examining the contract language to determine whether plaintiff should have, in fact, been so misled." Paschen Contractors, Inc. v. United States, 418 F.2d 1360, 1365, 190 Ct.Cl. 177, 188–189 (1969). In the last analysis, the case turns on whether plaintiff's contract is susceptible to more than one *reasonable* interpretation. Sturm v. United States, *supra*; Paschen Contractors, Inc. v. United States, *supra*.

■ This question must be approached with due accord to settled doctrine: that the provisions of any contract must be read as a whole; that an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless; and that a contractual provision should be construed as being in conflict with another only where no other reasonable interpretation is possible. Embassy Moving & Storage Co. v. United States, 424 F.2d 602, 606, 191 Ct.Cl. 537, 543 (1970); Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395 (1965).

■ In essence, plaintiff contends that it was reasonable to interpret the contract in suit as requiring defendant to furnish *pattern* sizes 28 through 42, with pattern size 36 the median size. The keystone of this position is the assumption that a unit of groin armor designated, *e. g.*, "Waist size 28" was to be cut from a corresponding *pattern* size. In passing upon the contention, it is, of course, necessary to apply an objective, not a subjective, test,[12] and to consider the contract as a whole.

Whether, standing alone, Amendment No. 1 to the RFP might be subject to the interpretation that groin armor designated, *e. g.*, "Size 28" would be cut from a corresponding pattern size, not-

---

10. The administrative record reflects that "there was a requirement for 1,870, Size 28 (Waist) on another P/D," and that an RFP issued April 27, 1966, was amended on April 30, 1966, by deleting "from delivery requirements * * * 1870 units for size 28 * * *."

11. While plaintiff does aver generally that facts found by the Board "to support its interpretation [of the contract] were not

supported by substantial evidence", plaintiff takes specific issue with the Board's legal conclusions, not facts found by it. *Cf.* J. A. Jones Constr. Co. v. United States, 395 F.2d 783, 791, 184 Ct.Cl. 1, 15 (1968); Sundstrand Turbo v. United States, 389 F.2d 406, 422–423, 182 Ct.Cl. 31, 59–60 (1968).

12. Sturm v. United States, *supra*; Paschen Contractors, Inc. v. United States, *supra*.

withstanding the absence therein of mention of any pattern size, is not controlling. In determining whether plaintiff's interpretation is reasonable, all of the bid package must be considered. On a fair reading of paragraph 1.2, Specification MIL–A–43366, along with all other contract language, plaintiff's position is plainly an untenable one.

Paragraph 1.2 covered groin armor of "one type and two classes in the following sizes"; it then listed in tabular form a single set of pattern sizes, followed by the two "classes". Plaintiff "correlated" pattern sizes (Column 1) with Class 2 Navy "Waist" sizes (Column 3), dismissed them as irrelevant to the procurement, and then focused wholly on Column 2 (Class 1 Army "Waist" sizes).

Such an approach violates settled principles of contract interpretation. Embassy Moving & Storage Co. v. United States, *supra*; Hol-Gar Mfg. Corp. v. United States, *supra*. It leaves column 1 useless, inoperative, superfluous, and meaningless; notwithstanding an explicit allusion to pattern sizes in paragraph 1.2, would require defendant to furnish pattern sizes nowhere mentioned; and is unreasonable. *Ibid.*

Information presented in tabular form (as in paragraph 1.2) is normally, at least, to be read from left to right, with some relationship between the columns. Columns 2 and 3 of paragraph 1.2 both refer to "Waist" sizes, and Column 1, the only other column in the table, refers to pattern sizes. As the Board held, it is reasonable to conclude from this only that "the list of pattern sizes given must apply to both Class I and Class II."

Plaintiff argues, *inter alia*, that a particular waist size can be produced *only* from a pattern of the same size; that defendant therefore undertook to deliver to plaintiff *pattern* sizes 28 through 42; that paragraph 6.2 of Specification MIL–A–43366 (itself referring to paragraph 1.2 of the same Specification), justified, by its reference to "procurement documents" (Amendment No. 1,

as plaintiff defines them), plaintiff's disregard of Column 1; and that Amendment No. 1 specified sizes 28 through 42; these arguments, when considered in light of the clear import of paragraph 1.2 (and the contract language as a whole), have no merit.

This conclusion is strengthened by the provisions of paragraph 3.7, Specification MIL–A–43366, and by the legend on pattern size 36, both quoted *supra*. Plaintiff did not read the former (beyond its heading), and again dismissed as of no relevance or materiality the "Class–2–Navy" portion of the legend on pattern size 36.

Plaintiff asserts that it was not required to read paragraph 3.7, but that, had plaintiff done so, it would have had no impact on plaintiff's interpretation of the contract. Neither assertion is persuasive. As for the first, paragraph 3.7 provides detailed measurements to which finished units of groin armor must conform, and specifies the method of measuring finished units to determine whether they meet contract requirements. A bidder who bids without reading all of the provisions of the obligation he seeks to undertake surely does so at his own peril. As for the second, paragraph 3.7 lists only pattern sizes 36 through 50, whether the groin armor be Class 1 or Class 2, and thereby conforms precisely to paragraph 1.2. Applying the necessary objective test, a reading of paragraph 3.7 certainly *should* have shown plaintiff that its interpretation was unfounded.

Defendant places some reliance on the fact that the pattern roll, containing only pattern sizes 36 through 50, reflected, more than once, that it contained "All Sizes" and was complete. Plaintiff responds that it was not required to "unroll the pattern roll all the way." It is unnecessary here to assess this phase of the matter. For, plainly and significantly, the very pattern plaintiff selected and used as its "median" bears unequivocal indication that the same pattern should be used for both Class 1 Army, "Waist size 28", and Class 2 Navy,

"Waist size 36", groin armor. To say that this meaningful bit of information, admittedly known to plaintiff prior to submission of its bid, was disregarded as of no relevance or materiality is not sufficient explanation.

Plaintiff also urges that "defendant blundered into failing to make its meaning clear" in the contract, as shown by (a) a "history of prior procurements", (b) Interim Amendment No. 1 (February 10, 1966), to Specification MIL–A–43366, issued five days prior to the RFP but not furnished to plaintiff,[13] and (c) "clarification" of a subsequent RFP on groin armor. Plaintiff's reliance on this line of argument is misplaced.

■ First, whatever the "history of prior procurements", *plaintiff's* contract was neither ambiguous nor unclear. Thus, even had Interim Amendment No. 1 been supplied to plaintiff prior to bid submission, that document could have told plaintiff no more than it should have already known. Finally, clarification in a subsequent procurement of language which has theretofore given rise to disagreement is only wise. The clarification cannot serve to forgive an unreasonable interpretation of the earlier language, nor properly be regarded as an admission that it was in fact ambiguous. While defendant may have drafted a subsequent contract "with greater clarity" than it did plaintiff's, it does not follow that plaintiff's was "ambiguous so as to require that the scales be weighted against the Government." N. Fiorito Co. v. United States, 416 F.2d 1284, 1288, 189 Ct.Cl. 215, 222 (1969).

Plaintiff proffers still other arguments in connection with its claim of right to benefit under the "zone of reasonableness"[14] doctrine. Plaintiff's basic position being without merit, these arguments need not be specifically enumerated, but each of them has been carefully considered and found insufficiently to justify a different result.

The decisions of this court teach that a contract amenable to only one reasonable construction, in light of all of its provisions, should be enforced according to its tenor as a whole "without regard to possible ambiguity in only one provision." Bishop Engineering Co. v. United States, 180 Ct.Cl. 411, 415–416 (1967); Construction Service Co. v. United States, 357 F.2d 973, 174 Ct.Cl. 756 (1966). In light of all its provisions, plaintiff's contract was amenable to only one reasonable construction, not plaintiff's, and it is accordingly not entitled to recover.

### *Defendant's Counterclaim*

By April 22, 1966, plaintiff had cut from pattern size 36 2,336 fillers and 4,900 outer shells toward the fabrication of the 4,870 units of Class 1 groin armor designated "Waist size 36", called for by the contract. Pattern size 36 yielded Class 1 groin armor designated "Waist size 28", however, and only 290 units of this size were to be delivered to defendant under plaintiff's contract. To mitigate plaintiff's loss, defendant, by Contract Modification No. 2 (Appendix A), ordered an additional 1,870 units of "Waist size 28" groin armor from plaintiff.

Defendant now says that ordering an increased quantity of the smallest unit of groin armor here involved required less government-furnished material than would have been required had defendant effected a quantity increase of *all* "Waist" sizes (28 through 42) in numbers proportionate to the quantities of each such size involved in the original procurement; that, under the terms of the "Option for Increased Quantity" clause set forth in Appendix B, the increased quantity should have been furnished in proportionate sizes, rather than all one size; and that under the "Sized Items" clause also set forth in Appendix B, defendant is entitled to a downward adjustment in price in conse-

13. No explanation for this omission appears in the record.

14. WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963).

quence of the savings in material usage. The "adjustment" claimed is $4,116.57.

■ ■ Defendant's brief simply asserts a savings of certain amounts of cloth, at stated prices per yard, with no citation to any portion of the record supporting its yardage calculation. It is clear that, in this Wunderlich Act review, defendant may not have summary judgment in a specific monetary amount on a contention totally unexplored administratively. But, defendant is not entitled to recover on its counterclaim in any event.

In the agreement between plaintiff and the contracting officer (Appendix A), the quantity, size, price, and time of delivery of the additional units of groin armor are incorporated. Defendant has furnished no sound justification, reason, or authority for disturbing that agreement, entered into by both parties with full knowledge of all of the contract terms and facts of the case. *Cf.* Arthur Venneri Co. v. United States, 381 F.2d 748, 750–751, 180 Ct.Cl. 920, 924–925 (1967); Roberts v. United States, 357 F.2d 938, 945–947, 174 Ct.Cl. 940, 951–954 (1966).

If plaintiff was spared some of the loss attributable to having cut too many "size 28" units, and wastage of material was minimized, defendant received units of groin armor it needed,[15] at a time when it had no right to them under the terms of plaintiff's original contract, at a price it agreed to pay (and, until after the filing of plaintiff's suit in this court, had not questioned). No sound basis for permitting defendant, at this late date, to upset that agreement appears. *Ibid.*

## CONCLUSION

Therefore plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and plaintiff's petition is dismissed. Defendant's counterclaim is also dismissed.

### APPENDIX A
*Contract Modification No. 2*

### AMOUNT OF MODIFICATION
*$39,737.50*

☒ Increase ☐ Decrease ☐ No Change

The above-numbered contract is modified as follows:

1. Formalizing verbal agreement established between contractor and Contracting Officer in telecon dated 29 April 1966, the "Option For Increased Quantity" Clause in the above-referenced contract is amended as follows:

   Part 3—delete in its entirety

   Part 5—delete "90 days" and substitute "30 days"

2. Formalizing verbal instructions of the Contracting Officer in telecon dated 29 April 1966, the "Option For Increased Quantity" Clause, as amended above, is hereby invoked for 1,870 units.

3. The original contract quantity of 14,060 units is increased by 1,870 units, Armor, Groin Class I for a grand total of 15,930 units.

4. The aforesaid-mentioned option quantity of 1,870 units is as follows:

ADD:

| Delivery Schedule FSN Site 8470-753-6110 Waist Size 28 | Item No. | *Dest | Delivery Increments & Quantities | | |
|---|---|---|---|---|---|
| | | | 00 | 90 | Total |
| | 1 | SAT | 200 | 400 | 600 |
| | 2 | SUT | 420 | 350 | 770 |
| | 1A | AAT | 150 | 190 | 340 |
| | 2A | SMT | 70 | 90 | 160 |
| Total | | | 840 | 1,030 | 1,870 |

*Destinations*
SAT—Defense Depot Mechanicsburg, Mechanicsburg, Penna.
AAT—Atlanta Army Depot, Forest Park, Georgia
SMT—Defense Depot, Memphis, Tennessee
SUT—Defense Depot, Ogden, Utah
[A2994]

5. The total contract price is increased by $39,737.50 as follows:

Total amount alloted to CMT cost .... $15,165.70
Total Government Material Value (Estimated) ........................ 24,571.80
Total ........................ $39,737.50

6. The delivery requirement of the Option Quantity is as follows:

840 each additional on or before 16 May 1966

1030 each additional on or before 15 June 1966

---

15. See note 10, *supra.*

7. Acceleration of deliveries authorized at no additional cost to the Government.

8. All terms, conditions and bidder's representation set forth in above-numbered contract are applicable to the option quantity hereunder and made a part of the Supplemental Agreement.

### APPENDIX B

#### *The Option Clause*

#### (102.8) OPTION FOR IN-CREASED QUANTITY

1. The Government may increase the quantity of supplies called for herein by an amount not to exceed 50% of the item(s) or sub-item(s) awarded. The contracting officer may exercise this option at any time within the period specified herein, by giving written notice to the contractor.

2. Unless a different optional quantity price(s) is indicated below, bidder/offeror agrees to furnish the optional quantities (in proportionate sizes to each respective destination, if the item is subject to sizes) at the lowest unit price specified in the schedule for the item(s) or sub-item(s) and destination involved:

#### Unit Price(s) for Optional Quantity

3. In the event the Government elects to exercise all or any part of the option quantity, deliveries of the items added by the exercise of this option shall be made after the final scheduled delivery on the contract, taking into account any adjustments to the delivery schedule made in writing by the Government, in accordance with the following:

50% of exercised optional quantity—within 30 days

additional 50% of exercised optional quantity—within 60 days

4. Bids/offers will be evaluated on the basis of the quantities to be awarded, exclusive of the option quantity unless the Government elects to exercise the option at the time of the award, in which case evaluation will be on the basis of total quantity to be awarded, including the option quantity.

5. The option to purchase the above item(s) or sub-item(s) shall be exercised not later than 90 days before final scheduled delivery as defined in Paragraph 3 above.

6. The above provisions do not apply to the restricted portion of partial set-aside procurements.

*Supplemental General Provision No. 41*

#### 41. SIZED ITEMS

a. Bids, proposals, and contracts resulting therefrom, for quantities less than the quantity herein specified for each item by destination, shall be in the same ratio to the total quantity specified for each size by destination in the Invitation for Bids or Request for Proposals, except that when the total quantity herein specified for any size is determined by the Contracting Officer to be impractical for prorating between contractors, the Government reserves the right to award such total quantity to any one contractor. Unless otherwise specifically permitted in the Invitation for Bids or Request for Proposals, quotations limited to selected sizes only or quantities of sizes not in the same ratio as the stated tariff of sizes by destination will not be considered for award.

b. Contractors will make all shipments in even case lots limited to one size. In the event that monthly delivery requirements result in less than case lot quantities remaining for shipment at the end of any one month, contractor will hold said quantity until even case lot quantity is obtained. Where shipment in even case lot quantity is impracticable because it is the final shipment, the contractor may ship less than even case lot quantity limited to one size to a case. Deviations from the foregoing must be authorized in writing by the Contracting Officer prior to shipment.

c. Sizes and/or quantities of each size awarded are subject to change by the Contracting Officer. Any such change shall be deemed to be a change within the purview of the Article entitled "Changes;" however, the Government and the contractor agree that the mone-

tary adjustment shall be limited to the value of the saving or excess in material usage. (No adjustment will be made for increase or decrease in labor, overhead, or pack and packaging costs.) The saving or excess usage shall be determined by using unit allowances computed as hereinafter provided. The unit allowance for any size which is added, changed or deleted during the course of the contract shall be computed by taking the yardage required to make a single size marker with the pattern laid out on it 4 times and dividing the yardage so required by 4. The unit allowance for any given size added, changed, or deleted shall be multiplied by the number of items of that size required prior to the change and the number of items of that size required after the change. The difference between the 2 results will be the difference in material usage for that size caused by the change in size. The computations set forth above shall be made for each size added, changed, or deleted, and the final total of all the differences, subtracting and adding where appropriate, shall be the saving or excess in material usage. This excess or savings in usage shall be converted to dollars and the resultant total shall be the sole equitable adjustment.

(1) On contracts where GFM is utilized and the change in sizes affects the usage requirements, payment shall be made by a modification crediting contractor's material usage account where the usage requirement increases, and charging contractor's material usage account where the usage requirement decreases.

(2) On contractor furnished material contracts where the change in sizes affects the usage requirement of the CFM, payment shall be effected by a change order either increasing or decreasing the contract price whichever is appropriate in CFM contracts. .

(3) Notwithstanding the above, however, where, as a result of the change in sizes, work in process and/or residual inventory, i. e., components, raw materials, etc., cannot be utilized, an additional adjustment will be made to compensate the contractor for the direct costs expended (if Government Furnished Property is involved, material credit will be given for the work in process). In the event an adjustment is made, the Contracting Officer shall have the right to prescribe the manner of disposition of the property for which the contractor has been compensated.

d. The method of adjusting for size changes indicated in paragraph C above also will be applied to pattern changes.