**RAYTHEON COMPANY**

v.

**The UNITED STATES.**

No. 180–82C.

United States Claims Court.

June 28, 1983.

---

**17.** *See* and *compare Atlantic Richfield Co. v. United States,* 1 Cl.Ct. 261 (1982) (KOZINSKI, C.J.).

John M. Geaghan, Wayland, Mass., for plaintiff.

Sara V. Greenberg, Washington, D.C., for defendant. Asst. Atty. Gen. J. Paul McGrath, David M. Cohen, and James D. Duffey, Jr., Dept. of the Navy, Washington, D.C., of counsel.

## OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

WHITE, Senior Judge.

The plaintiff, Raytheon Company (Raytheon), seeks Wunderlich Act review of a decision by the Armed Services Board of Contract Appeals (ASBCA or Board) denying the plaintiff's claim for royalties allegedly due pursuant to the standard (1967) Value Engineering Incentive (VEI) clause included in contract No. N00024–72–C–1310 (contract C–1310) between Raytheon and the defendant. Contract C–1310, which the Department of the Navy awarded to Raytheon on June 14, 1972, was for the produc-

tion of certain sonar equipment at an initial total cost of $20,384,415.

The parties have filed cross-motions for summary judgment. For the reasons stated in the opinion, the court concludes that there are no genuine issues of material fact in dispute, that the plaintiff is not entitled to recover, and that the complaint should be dismissed. In addition, it is concluded that the defendant is entitled to judgment in the amount of $11,719 on its counterclaim against Raytheon.

The standard VEI clause provides that a contractor may submit proposed contract changes reducing the cost of performance, and that, if the Government approves the proposal, the contractor is entitled to share in the cost savings. The VEI clause contained in contract C–1310 allowed Raytheon to share in three types of cost savings: instant contract, collateral, and future contract savings. Raytheon's present claim involves only its entitlement to future contract savings.

Paragraph (j)(1) of the VEI clause in contract C–1310 provided that Raytheon would receive royalties during a 2-year period in the amount of 40 percent of the future unit cost savings accruing from an approved cost reduction proposal. The issue in dispute between the parties is the beginning date of the 2-year period, or "window," during which the royalties were to be computed. Paragraph (j)(1)(ii) provided that the 2-year period commended on the later of two dates: (1) "the last originally scheduled delivery date" for items ordered under contract C–1310 utilizing the cost reduction proposal, or (2) "the date of acceptance of the cost reduction proposal." Specifically, paragraph (j)(1)(ii) provided in pertinent part as follows:

> (j)(1) If a cost reduction proposal is accepted under this clause, the Contractor will be paid (in addition to any adjustment under paragraphs (d) and (f) (if included) above) a royalty share of savings realized by the Government on future purchases, if any, of items utilizing

the cost reduction proposal. The Contractor's royalty share will be forty percent (40%) of the unit cost reduction under this contract (without deducting any cost of development or implementation) multiplied by the quantity of Item 0001 which .

> (i) utilize the cost reduction proposal pursuant to the specifications of other provisions of any other contract of the Naval Ship Systems Command which is awarded after acceptance of the cost reduction proposal, and

> (ii) are originally scheduled for delivery not later than two (2) years after either the last originally scheduled delivery date for any such item under this contract or the date of acceptance of the cost reduction proposal whichever is later, and

> (iii) are accepted by the Government under such other contracts.

Pursuant to the VEI clause contained in contract C–1310, Raytheon submitted Value Engineering Change Proposal (VECP) No. 1 to the Government on January 31, 1973. Estimating that the net total cost savings resulting from the proposal were $278,077, Raytheon proposed that it was entitled to 50 percent of the instant contract savings pursuant to paragraph (d) of the VEI clause and a 40 percent future royalty share in accordance with paragraph (j)(1), quoted above.[1]

On June 28, 1973, the plaintiff and the Government executed Modification P00005 (Modification 5), which stated in part as follows:

> VECP No. 1 is hereby approved as stated in the Contractor's letter of 31 January 1973 * * *.

> Any adjustment in the contract price resulting from the foregoing specification change will be established in accordance with the "VALUE ENGINEERING IN-CENTIVE" and the "CHANGES" Clause of this contract.

1. In order to maintain contractual delivery dates, Raytheon requested the Government to provide authorization to proceed no later than February 19, 1973.

Deliveries under contract C–1310 were originally scheduled to begin on December 1, 1973, and end on February 1, 1975. However, in November 1973 and January 1974, the plaintiff requested changes in the delivery schedule. As a result, on April 30, 1974, the contracting officer issued Modification P00010 (Modification 10), which changed the first delivery date to March 1974 and the last to September 1975.[2]

On May 21, 1974, the plaintiff executed Modification P00011 (Modification 11), which established that the plaintiff was entitled to 50 percent of the instant contract savings resulting from VECP No. 1 and fixed a specific dollar amount. Modification P00012 (Modification 12), executed by the contracting officer on June 24, 1974, revised the computation made in Modification 11.

On July 28, 1976, the parties executed Modification P00023 (Modification 23), which established the per item or partial item amount for calculating future royalties and provided for future royalties in the amount of $216,150 under two subsequent contracts, C–1124 and C–1258, for items utilizing VECP No. 1. The contracting officer concluded that Modification 23 also established that the 2-year window for future royalty payments would begin on February 1, 1975, the last originally scheduled delivery date, and end on February 1, 1977. The contracting officer chose February 1, 1975, as the opening date because it was later than the date on which he concluded that the cost reduction proposal was accepted, June 28, 1973, this being the date when Modification 5 was executed. The contracting officer also used Modification 23 to correct an error which had occurred in the computation of instant savings under Modification 11.

In a letter to the contracting officer, the plaintiff subsequently sought royalty payments for items utilizing VECP No. 1 that were contracted for pursuant to contracts C–6147 and C–6160. Both contracts scheduled some deliveries for dates after February 1, 1977, determined by the contracting officer to be the termination date of the 2-year window which, according to the contracting officer, Modification 23 had established. Nevertheless, the plaintiff contended that it was entitled to royalty payments on all items utilizing VECP No. 1 which were ordered pursuant to contracts *awarded* during the 2-year window, irrespective of the scheduled delivery dates for the items.[3] The plaintiff stated that the words "for delivery" in paragraph (j)(1)(ii) of contract C–1310 constituted merely a "non-essential subsidiary expression."

The contracting officer, in a final decision dated January 3, 1978, rejected the plaintiff's request for additional royalties, and stated that the Government would pay royalties only for "that quantity of *items* utilizing value Engineering Change Proposal No. 1 whose *original delivery dates* were no later than February 1977." [Emphasis added.] On January 27, 1978, the plaintiff appealed the final decision to the Armed Services Board of Contract Appeals (ASBCA No. 22711).

After the contracting officer issued his final decision, the plaintiff requested additional royalties for items utilizing VECP No. 1 contracted for pursuant to contract C–6129. All the items ordered under contract C–6129 were scheduled for delivery after the end of the 2-year window established in Modification 23. The plaintiff argued, however, that the contracting officer's final decision dated January 3, 1978, had established that the plaintiff's cost reduction proposal was accepted by the Government on July 28, 1976, the date Modification 23 was executed. The plaintiff relied on the following language in the contracting officer's decision:

---

**2.** Modification 10 also omitted the provision in the contract which stated that "all dates are the first day of the month." Hence, after Modification 10, delivery could be made on any date during the month.

**3.** Both contracts C–6147 and C–6160 were awarded during the 2-year royalty window. Contract C–6147 was awarded on March 22, 1976, and contract C–6160 was awarded on February 26, 1976.

* * * The cost reduction referred to in paragraph (j) of the Value Engineering Incentive Clause of the contract was established in Modification P00023, dated 28 July 1976. * * *

The plaintiff contended, therefore, that the 2-year window opened on July 28, 1976, as that date was later than the "last originally scheduled delivery date," February 1, 1975.

The contracting officer, in a final decision dated July 14, 1978, stated that the cost reduction proposal was accepted on June 28, 1973, with the execution of Modification 5, and again rejected the plaintiff's request for additional royalties. On August 7, 1978, the plaintiff appealed the second denial.

In a decision dated November 17, 1981 (ASBCA No. 23179), the Armed Services Board of Contract Appeals denied the plaintiff's appeals.[4]

The plaintiff filed the present action on April 9, 1982, in this court's predecessor, the United States Court of Claims. The plaintiff proposed four alternative theories of recovery to the ASBCA, and urges three of these theories upon the court.

■ Before considering each of the plaintiff's arguments, however, it is appropriate to state the applicable standard of review in Wunderlich Act cases. Under that act, the Board's determinations on issues of fact are final and conclusive and cannot be overturned unless they are fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. 41 U.S.C. § 321 (1976). On the other hand, questions of law resolved by the Board are not binding upon the court. 41 U.S.C. § 322 (1976). Moreover, issues of contract interpretation are regarded as question of law. Therefore, the Board's interpretation of a contract is not binding on the court, although its determination "will be given careful consideration and accorded great respect." *George Hyman Construction Co. v. United States,* 215 Ct.Cl. 70, 80, 564 F.2d 939, 944 (1977); *see also Dale Ingram, Inc.*

*v. United States,* 201 Ct.Cl. 56, 71, 475 F.2d 1177, 1184 (1973); *Winston Brothers Co. v. United States,* 198 Ct.Cl. 37, 47, 458 F.2d 49, 54 (1972); *Martin Lane Co. v. United States,* 193 Ct.Cl. 203, 206–07, 432 F.2d 1013, 1015 (1970).

The plaintiff does not dispute any of the Board's factual findings. Each of the plaintiff's contentions concerns the Board's interpretation of the VEI clause included in contract C–1310. It is concluded, however, that the Board's interpretation of the VEI clause is correct as a matter of law and must be upheld.

■ The plaintiff's first contention is that the 2-year royalty period commenced on July 28, 1976, the date when the parties executed Modification 23. According to the plaintiff, the execution of Modification 23 constituted acceptance of the plaintiff's cost reduction proposal. As stated earlier in the opinion, paragraph (j)(1)(ii) of the VEI clause in contract C–1310 provided that the royalty period would begin on either the date of acceptance of the cost reduction proposal or the last originally scheduled delivery date, whichever was later. Under the plaintiff's view, acceptance of its cost reduction proposal occurred later than the last originally scheduled delivery date, February 1, 1975.

The Board correctly determined that acceptance of the plaintiff's cost reduction proposal occurred with the execution of Modification 5 on June 28, 1973. The last originally scheduled delivery date was, therefore, the proper commencement date for the 2-year royalty period.

As quoted earlier in the opinion, Modification 5 stated in part that "VECP No. 1 is hereby approved as stated in the Contractor's letter of 31 January 1973 * * *." The subsequent modifications to the contract, including Modification 23, established adjustments in the contract price for the previously accepted VECP. Modifications 11 and 12 established the plaintiff's 50 percent

---

4. On February 19, 1982, upon the plaintiff's motion for reconsideration, the Board affirmed its decision.

share of "instant contract savings" pursuant to paragraph (d) of the VEI clause. Modification 23 corrected an error in the computation of instant contract savings under Modification 11 and established the per unit royalty share for items utilizing VECP No. 1 manufactured under future contracts. The execution of Modification 23 occurred 3 years after Modification 5 was issued and 2 years after the parties agreed on the amount of instant contract savings. Moreover, delivery of items incorporating VECP No. 1 began, under the revised schedule, more than 2 years before the date when, according to the plaintiff, its cost reduction proposal was accepted. Clearly, therefore, Modification 23 did not constitute the acceptance of the plaintiff's cost reduction proposal.

The plaintiff relies in part on the contracting officer's final decision dated January 3, 1978, which included the following statement:

> * * * The cost reduction referred to in paragraph (j) of the Value Engineering Incentive Clause of the contract was established in Modification P00023, dated 28 July 1976. * * *

This language apparently recognizes merely that Modification 23 established the amount of the cost adjustment, not acceptance of the cost reduction proposal. In the same decision, the contracting officer concluded that the royalty period commenced on the date of the last originally scheduled delivery, February 1, 1975. If the contracting officer believed that Modification 23 constituted the acceptance of the plaintiff's cost reduction proposal, he would have established July 28, 1976, as the opening date for the royalty window.

As one basis for its theory that acceptance of its cost reduction proposal occurred on July 28, 1976, the plaintiff argues that acceptance of a cost reduction proposal is a two-step procedure: first, the Government approves the technical aspects of the contractor's value engineering change proposal; and, second, according to the plaintiff,

the parties must agree on the amount of the cost reduction and the arrangements for cost sharing. The plaintiff contends that acceptance of a cost reduction proposal occurs only after completion of the second step.

As support for its theory of a bifurcated procedure, the plaintiff relies on the use of the terms "value engineering change proposal" and "cost reduction proposal" in the VEI clause of contract C–1310.[5] The distinction has significance, argues the plaintiff, because paragraph (j)(1)(ii) establishes the date of acceptance of the "cost reduction proposal" as one of the two possible dates for measuring the royalty window. Under the plaintiff's theory, the first step in the process, acceptance of the value engineering proposal (VECP No. 1), occurred when the parties executed Modification 5, but the second step, acceptance of the cost reduction proposal, was completed only with the execution of Modification 23.

The Board properly dismissed the plaintiff's theory of a two-step acceptance process under the VEI clause. The purported bifurcated procedure is neither explicitly nor implicitly provided for in the clause. In particular, the plaintiff's proposed distinction between a value engineering change proposal and a cost reduction proposal is unpersuasive.

■ The general rule is that a contract should be interpreted as a whole. *Merando, Inc. v. United States,* 201 Ct.Cl. 28, 30, 475 F.2d 603, 605 (1973). A reading of the VEI clause indicates that the terms "value engineering change proposal" and "cost reduction proposal" are used interchangeably. The term "cost reduction proposal" refers generally to the engineering aspects of a proposal as well as to the cost aspects. For example, paragraph (a)(1) of the VEI clause in contract C–1310 states that the clause "applies to those cost reduction proposals initiated and developed by the Contractor for changing the drawings, designs, specifications, or other requirements of this con-

---

5. The term "value engineering change proposal" was used 13 times in the VEI clause, and the term "cost reduction proposal" was used 27 times. The contract did not define the terms.

tract." Paragraph (a)(2) provides that "[t]he cost reduction proposals contemplated are those that (i) would require, in order to be applied to this contract, a change to this contract; and (ii) would result in savings to the Government * * *." Furthermore, the language in paragraph (j)(1)(i) providing for future royalty payments for items "utilizing the cost reduction proposal" plainly refers to items which utilize the value engineering aspects of a proposal.

Paragraph (c)(1) also illustrates the interchangeable use of the terms "value engineering change proposal" and "cost reduction proposal." The paragraph states that "[c]ost reduction proposals shall be processed expeditiously" and that a contractor has the "right to withdraw, in whole or in part, any value engineering change proposal not accepted by the Government within the period specified in the proposal." Paragraph (c)(2) states that a contracting officer "may accept, in whole or in part, either before or within a reasonable time after performance has been completed under this contract, any cost reduction proposal" by giving the contracting officer written notice of acceptance. If performance of the contract has not been completed, the notice can be given by issuance of a change order under the contract. However, "[u]nless and until a change order applies a value engineering change proposal to * * * [the] contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract."

The plaintiff also argues that use of the terms "value engineering change proposal" and "cost reduction proposal" in the VEI clause created an ambiguity which, under the rule of *contra proferentem,* must be construed against the Government, the drafter of the contract. The rule is applicable, however, only when the contractor's interpretation is reasonable. *Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390, 418 (1947). The foregoing discussion demonstrates that the VEI clause was not reasonably susceptible to the interpretation that a two-step acceptance procedure was required and that the terms "value engi-

neering change proposal" and "cost reduction proposal" have different meanings.

The plaintiff contends that a change in the 1974 Value Engineering Incentive clause, which substituted the term "value engineering change proposal" for the term "cost reduction proposal" wherever the latter term appeared in the 1967 clause, supports the plaintiff's argument that the 1967 clause was ambiguous. However, as the Court of Claims once stated, clarification of language used in contract forms "cannot serve to forgive an unreasonable interpretation of the earlier language, nor properly be regarded as an admission that it was in fact ambiguous." *Martin Lane Co. v. United States, supra,* 193 Ct.Cl. at 218, 432 F.2d at 1021.

Moreover, the plaintiff never acted in reliance on its proposed interpretation of the VEI clause, an additional prerequisite to invocation of *contra proferentem.* *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). As explained earlier in the opinion, the plaintiff accepted "instant contract savings" pursuant to Modifications 11 and 12 before the date on which the plaintiff claims acceptance of the cost reduction proposal occurred—conduct that is clearly inconsistent with the plaintiff's proposed interpretation. Indeed, it appears that the plaintiff did not formulate its theory of a two-step acceptance procedure until after the contracting officer issued his final decision dated January 3, 1978.

The plaintiff's second theory of recovery is that even if the last originally scheduled delivery date is the proper measure for the 2-year window, that date was September 30, 1975, instead of February 1, 1975, as determined by the contracting officer. The basis for the plaintiff's contention is Modification 10, which changed the delivery dates for the items utilizing VECP No. 1 from December 1, 1973, to March 1974, for the first delivery, and from February 1, 1975, to September 1975, for the last delivery.

The plaintiff's theory ignores the plain language of the contract, which establishes that the "last *originally* scheduled delivery date" is controlling (emphasis added). The word "originally" has a plain and well understood meaning. WEBSTER'S THIRD INTERNATIONAL DICTIONARY (1976) defines "originally" as "from the first: in the beginning: in the first place." Certainly, the revised delivery date which Modification 10 established was not the original delivery date. Acceptance of the plaintiff's interpretation would in effect require the court to read the pertinent contract clause as if it stated "last scheduled delivery date."

■ It is, however, a well established rule of contract interpretation that "all provisions of a contract are to be given effect and no provision is to be rendered meaningless." *United Pacific Insurance Co. v. United States,* 204 Ct.Cl. 686, 692, 497 F.2d 1402, 1405 (1974). Moreover, as the Court of Claims stated in *Astro-Space Laboratories, Inc. v. United States,* 200 Ct.Cl. 282, 295, 470 F.2d 1003, 1010 (1972):

> * * * It is difficult to understand how plaintiff can urge an interpretation which would require the elimination of at least one word as reasonable. Indeed this is the type of interpretation that has consistently been found to be unreasonable. *Jamsar, Inc. v. United States,* 194 Ct.Cl. 819, 827, 442 F.2d 930, 934 (1971); *Hol-Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965).

The plaintiff cites *Guenther Systems, Inc.,* 77–1 BCA § 12,501 (ASBCA 1977) in support of its argument that the 2-year period can commence from a modified delivery date. However, as the Board concluded, the *Guenther* case is inapposite because it concerned an interpretation of the 1964 VEI clause, which did not include the critical word "originally."

It is clear, therefore, that the plaintiff's contention that the 2-year royalty period commenced on September 30, 1975, rather than February 1, 1975, is unreasonable and cannot be accepted.

■ The plaintiff's third alternative theory is that the contracting officer failed to exercise his discretionary authority reasonably in determining whether an alternative version of paragraph (j)(1) of the VEI clause authorized by ASPR 1–707.3(b) should have been included in contract C–1310. ASPR 1–707.3(b) provides in pertinent part as follows:

> Where the contract is for items which characteristically require an unusually extended period of time for production (*e.g.,* ship construction), it may be necessary, in order to provide sufficient incentive under the royalty sharing provision, to provide for a royalty on items accepted under all contracts awarded within the sharing period, even if the scheduled delivery date is outside the sharing period. Accordingly, if the contracting officer determines this to be the case, he may delete the following words from (i) and (ii)—"after acceptance of the cost reduction proposal, and (ii) are originally scheduled for delivery"—and renumber (iii) as (ii).

The alternative version of paragraph (j)(1) would have provided that the plaintiff could obtain royalties on any future contract "which is awarded not later than [a specified number of] years after either the last originally scheduled delivery date * * * or the date of acceptance of the cost reduction proposal whichever is later * * *."

The Board correctly concluded that there is no proof in the record that the contracting officer failed to exercise his discretion reasonably when he used the language of the standard version of paragraph (j)(1) of the VEI clause, rather than the alternative version authorized by ASPR 1–707.3(b). A successor contracting officer for contract C–1310 testified that he saw nothing in the files which indicated whether a specific determination had been made on whether to exercise the authority granted in ASPR 1–707.3(b). There is, however, no requirement in the regulations that the determination on this point be made by the contracting officer in writing. In effect, the determination by the contracting officer was

made when the parties agreed on a 2-year royalty window. Moreover, of greater significance is the Board's proper conclusion that if the plaintiff believed that a longer royalty window for the items contracted for was necessary, the plaintiff should have raised the matter prior to contract award. The length of the royalty period was the subject of negotiation; and the plaintiff could have sought a 3-year window under ASPR 1–703.3(b). The plaintiff may not now belatedly alter the terms of the agreement.

Finally, the plaintiff did not establish that the items called for in the contracts required "an unusually extended period of time," which was the basis for using the alternative version of paragraph (j)(1) under ASPR 1–707.3(b). Evidence in the record reveals that the usual lead time for ship construction, the example cited in ASPR 1–707.3(b), is 36 months. The lead time for production of the sonar equipment incorporating VECP No. 1 was, however, only 21 months.

Consequently, the plaintiff's contention that the contracting officer failed to exercise his discretion reasonably must be rejected.

By way of summary, none of the plaintiff's alternative theories of recovery can be accepted as justifying the entry of judgment in favor of the plaintiff.

### The Defendant's Counterclaim

At the Board hearing, the contracting officer testified that he had calculated the last day of the 2-year royalty period to be February 1, 1977. The Board concluded that the contracting officer's determination was in error. As the royalty period commenced on February 1, 1975, it actually ended on January 31, 1977. The plaintiff, however, received royalty payments in the respective amounts of $9,115 and $2,604 for items delivered on February 1, 1977, under contracts C–6147 and C–6160. Consequently, the Board concluded that the plaintiff received overpayments in the total amount of $11,719.

■ The Government is entitled to a refund of all amounts erroneously or illegally paid. *United States v. Wurts,* 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938); *Lodge 2424, International Association of Machinists v. United States,* 215 Ct.Cl. 125, 135, 564 F.2d 66, 71 (1977); *Fansteel Metallurgical Corp. v. United States,* 145 Ct.Cl. 496, 500, 172 F.Supp. 268, 271 (1959).

■ The plaintiff has not challenged the Board's determination of overpayment, which is supported by the record. The defendant is therefore entitled to judgment in the amount of $11,719 on its counterclaim.

### Conclusion

For the reasons stated in the opinion, the court concludes that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law, both as to the plaintiff's claim and on the defendant's counterclaim.

Accordingly, the plaintiff's motion for summary judgment is denied, and the defendant's cross-motion for summary judgment is granted.

The complaint will therefore be dismissed.

Judgment in the amount of $11,719 will be entered for the United States on its counterclaim.

IT IS SO ORDERED.