## TITAN PACIFIC CONSTRUCTION CORP.

v.

## The UNITED STATES.

### No. 747–87C.

United States Claims Court.

July 18, 1989.

Lawrence Schor, Washington, D.C., attorney of·record for plaintiff. Schnader, Harrison, Segal & Lewis, of counsel.

Steven A. Hemmat, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton for defendant. Richard A. Gallivan, Office of General Counsel, Dept. of the Navy, of counsel.

## ON CROSS MOTIONS FOR SUMMARY JUDGMENT

## OPINION

HARKINS, Senior Judge:

■ Titan Pacific Construction Corporation, in a complaint filed December 7, 1987, seeks review of a decision of the Armed Services Board of Contract Appeals (ASBCA or Board) on appeals under a Navy contract awarded by the Naval Facilities Engineering Command, OICC Trident.[1] Plaintiff invokes the Claims Court Tucker Act jurisdiction and Wunderlich Act standards.[2] The contract, awarded June 7, 1977, is not subject to the Contract Disputes Act of 1978.[3] Review in the Claims Court of a decision of a contract appeals board is an appellate anomaly that results from enactment of the Contract Disputes Act of 1978 and the creation of the Claims Court in the Federal Courts Improvement Act of 1982. The standards and procedures applicable to this appellate function are those developed in the former Court of Claims. These procedures provide for the transfer to the court of the administrative record, and review of that record under the standards established by the Wunderlich Act and the Supreme Court in a trilogy of decisions. The Claims Court may not take new evidence or redetermine the facts; the issues are formed in motions for summary judgment.[4]

Plaintiff's contract was for the relocation of ordinance facilities at the Naval Torpedo Station (now Naval Undersea Warfare Station), Indian Island Annex, Keyport, Washington. The contract price was $7,928,200. The work included the construction of several new buildings and a 0.7 million gallon reservoir with an access road, alterations and additions to existing structures, installation of a utility system, and relocations, improvements and extensions of approximately 9 miles of roads. Earth work for the project consisted of clearing, grubbing, and stripping of approximately 120 acres of dense forest, approximately 150,000 cubic yards of excavation, and approximately 100,000 cubic yards of fill.

The project was divided into three distinct phases, each with separate completion dates and different per day amounts for liquidated damages. Phase I was to be completed within 90 calendar days, Phase II within 390 calendar days, and Phase III within 600 calendar days, of the notice of award. The notice of award was June 11, 1977, and the completion date for Phase III initially was February 12, 1979. The sequence of work in Phase III was in stages 1 and 2. Stage 1, was earthwork and road-

**1.** Contract No. 68248–76–C–6020, 87–1 BCA ¶ 19,626.

**2.** 28 U.S.C. § 1491(a) (1982); 41 U.S.C. §§ 321–22 (1982).

**3.** 41 U.S.C. §§ 601–13 (1982).

**4.** *See Vista Scientific Corp. v. United States,* 808 F.2d 50 (Fed.Cir.1986) (explanation of historical development); *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963) (aside from questions of fraud, a reviewing court is limited to the administrative record on a question arising under the disputes clause); *United States v. Anthony Grace & Sons,* 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966) (where Board has not considered claim on merits, remand to Board for evidentiary hearing required to determine factual issues); *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) (Board's findings of fact on issues properly before it are final and conclusive in subsequent breach of contract actions).

work relative to six designated roads; stage 2 was all other Phase III work.

The contract was on standard forms and the general provisions included Standard Form 23–A clauses for Changes (1968 Feb), Differing Site Conditions (1968 Feb), Disputes (1964 Jun), Suspension of Work (1968 Feb), and Termination for Default—Damages for Delay—Time Extensions (1969 Aug). For monitoring and control purposes, the Critical Path Method (CPM) was specified.

The Navy, during contract administration, increased the contract price to $8,302,-351. The completion date for Phase I was extended from July 20, 1977, to October 20, 1977. The Phase I work was accepted on March 27, 1978 (158 days late), and liquidated damages of $3,950 were assessed. The completion date for Phase II was extended from July 17, 1978, to July 21, 1978. The work was accepted on October 30, 1978, (101 days late), and $8,787 in liquidated damages were assessed. The Phase III work was extended from February 12, 1979, to May 20, 1979. The work was accepted as substantially complete on February 7, 1980 (263 days late), and liquidated damages of $214,871 were assessed.

In its appeals to the ASBCA, plaintiff sought a total of 899 days for excusable delays, equitable adjustments in the amount of $6,850,874.32 and return of $232,510 withheld as liquidated damages. The appeal to the ASBCA was limited to entitlement issues. The administrative record submitted to the court includes transcripts of a 21–day hearing held during the latter part of 1984, and was contained in 21 boxes of materials and exhibits shipped directly from archival storage.

The ASBCA opinion, dated January 28, 1987, comprises 73 pages; it is a comprehensive and detailed analysis of the facts and law applicable to the claims plaintiff submitted to the Board. The opinion includes 151 findings of fact. The Board determined that as to Phase I, there were no excusable delays in the 120 days claimed, and that the $3,950 in liquidated damages was properly assessed. As to

Phase II, the Board denied claims for time extensions amounting to 516 days, found that the Navy had contributed to the 101 calendar days delay to the revised completion date, that fault of the plaintiff and its subcontractors precluded compensation for delay damages, and set aside the $8,787 assessed in liquidated damages.

On the Phase III claims, the Board extended the completion date to September 29, 1979, allowed 121 calendar days delay for Phase III earthwork and 51 calendar days delay for completion of Phase III buildings. The assessment of liquidated damages for Phase III work for the period May 20, 1979, to September 29, 1979, was set aside. Plaintiff's claims in this court are concerned only with review of the Board's decision relative to Phase III work.

*Wunderlich Act Review Standards*

The motion papers reflect confusion as to the standards applicable and the scope authorized in a review of the administrative record before the Board on claims under the Disputes clause. Plaintiff's complaint states that relief is sought "exclusively" under 41 U.S.C. § 321 and plaintiff's motion states its appeal on questions of fact is limited to the "substantial evidence" standard. Plaintiff, however, contends that some of the Board's findings present mixed questions of fact and law, and that the court is free to make an independent review of the Board's factual and legal conclusions. Defendant argues that plaintiff's "mixed fact and law" issues are predicated on assumptions of fact rejected by the Board, and that plaintiff seeks to retry the Board's findings.

■ The Wunderlich Act, codified in two sections, applies to contract provisions relating to the finality of Board decisions on disputes arising under the contract on issues of fact and questions of law. Administrative determinations of disputes of fact are conclusive and binding in a judicial review unless the decision is "fraudulent or capricious or arbitrary or so grossly erroneous as to imply bad faith, or is not sup-

ported by substantial evidence."[5] A Board's decision on a question of law, however, is not final and is not binding in subsequent judicial review.[6]

The term "substantial evidence" as applied to factual issues is a term of art that has been given content in numerous decisions. The standard on which an administrative record is to be judged goes to the reasonableness of what the agency did on the basis of the evidence before it.[7] In *Koppers,* the Court of Claims collected the precedents and established guidelines for application of the "substantial evidence" requirement.[8] The guidelines applicable to, and limitations on, the judicial review of the Board's decision may be summarized to include the following:

> The scope of judicial review is narrow, and is limited to whether there was substantial evidence—such evidence as might convince a reasonable man—to support the conclusion reached by the agency officials.[9]

> The entire administrative record is before the court, and the plaintiff has the burden of establishing the fact that the record does not support the Board's finding. It is not the court's function to cure plaintiff's deficiency "by an independent excursion along the administrative trail." [10]

> *Substantial* evidence is evidence which could convince an unprejudiced mind of the truth of the facts to which the evidence is directed. Evidence may be substantial even if it is the sole evidence in a case, *e.g.,* expert testimony. The amount of testimony, however, is not necessarily determinative, *e.g.,* if the only evidence is

a series of isolated statements in the record.[11]

Reasonable inferences fairly drawn from the evidence are for the administrative tribunal. Where two equally reasonable but contrary inferences might be drawn from the record, and each could be sustained as supported by substantial evidence, the one adopted by the Board should be sustained. Moreover, where conflicting testimony is in the record, the Board's preference will, generally, not be disturbed unless the court can conclude that the findings are not supported by some evidence which qualitatively and, in appropriate circumstances, quantitatively, can be deemed substantial evidence when the record is viewed as a whole.[12]

In limited circumstances the court will decide an issue of fact not decided by the Board, or contrary to the finding made by the Board. Such action is not considered unless the court first concludes that there is no substantial evidence to support the Board's findings. The Board's findings may be supplemented when evidence on the fact question is undisputed, and a contrary finding may be made when the overwhelming weight of the evidence points to one conclusion of fact.[13]

The substantial evidence rule requires consideration of both opposing evidence and evidence that supports the Board's findings. The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.

**5.** 41 U.S.C. § 321 (1982).

**6.** 41 U.S.C. § 322 (1982); *Fortec Constr. v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985).

**7.** *United States v. Carlo Bianchi & Co.,* 373 U.S. at 715, 83 S.Ct. at 1413.

**8.** *Koppers Co. v. United States,* 405 F.2d 554, 556–59, 186 Ct.Cl. 142 (1968).

**9.** *Sundstrand Turbo v. United States,* 389 F.2d 406, 410, 182 Ct.Cl. 31 (1968); *T.C. Bateson Constr. Co. v. United States,* 149 Ct.Cl. 514, 518 (1960).

**10.** *Sundstrand Turbo v. United States,* 389 F.2d at 422–23; *Jefferson Constr. Co. of Florida v. United States,* 364 F.2d 420, 424, 176 Ct.Cl. 1363 (1966), *cert. denied,* 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967).

**11.** *Koppers Co. v. United States,* 405 F.2d at 558.

**12.** *Koppers Co. v. United States,* 405 F.2d at 558.

**13.** *Id.* at 559.

Where, however, the opposing evidence is *not* overwhelmingly in favor of the opposing view, the view of the facts adopted by the Board, if otherwise proper, will be sustained. If there is adequate and substantial evidence to support either of two contrary findings of fact, the one adopted by the Board is binding on the court, whatever its own evaluation of the evidence might be.[14]

On questions of law, although the Board's interpretation is not binding, its interpretation is entitled to careful consideration and accorded due respect in recognition of its special expertise.[15]

In Wunderlich Act reviews, the Court of Claims guidelines have been followed in this court.[16]

*Disposition*

■ Plaintiff identifies three of its claims as mixed questions of fact and law: (1) application of time extensions to Phase III project completion date; (2) acceleration of earthwork performance; and (3) issuance of a constructive stop work order with regard to a change (PC 9). Plaintiff argues that when a finding is a composite of fact and law, it is not binding where an error of law induced the factual finding. In its analysis of the factual elements in these claims that allegedly contain mixed questions of fact and law, plaintiff argues that when all of the evidence on both sides of these issues is examined, plaintiff's evidence in opposition to the Board's findings is substantial. Plaintiff contends that when it shows the evidence in support of its position is substantial, the quality of its evidence shows the evidence relied upon by the Board was not substantial.

Plaintiff fails to appreciate that, in a Wunderlich Act review, the test is whether the Board's contrary finding of fact is supported by substantial evidence. If, on the issue as a whole, substantial evidence supports both sides, the facts as found by the Board are binding. The Board, as the trier of fact, evaluates the evidence and the credibility of the witnesses. Here, plaintiff's evidence in opposition does not render the evidence in support of the Board's findings less than substantial on the record as a whole. Plaintiff's contentions, relative to claimed mixed questions of fact and law, would have the court retry factual issues that already have been resolved by the Board. Plaintiff's position on these mixed questions is predicated on assumptions of fact that the Board has considered, and on the basis of substantial evidence, has rejected.

■ The focal point of plaintiff's appeal is the "like-time" theory of awarding time extensions. The "like-time" theory would require time extensions to be awarded during months when the performance of delayed work is feasible. The ASBCA's failure to apply properly the "like-time" theory, plaintiff asserts, is the common strand from which all issues in this appeal are drawn, particularly the determination of the completion date, the remission of liquidated damages and contract acceleration.

Contract administration granted time extensions for Phase III work of 97 calendar days, 66 of which were for unusually severe weather conditions: 35 days for weather during the period June 7, 1977, to October 2, 1978; 18 days in the period March 30, 1979, to April 17, 1979; and 13 days in the period March 1, 1979, to July 31, 1979. The 97–day extension revised the contract completion date for Phase III from February 12, 1979, to May 20, 1979.

The Board determined that plaintiff sustained no delays to its Phase III earthwork activities during 1977 due to unusually severe weather, and that earthwork and roadwork were excusably delayed by abnormal weather for 60 calendar days in 1978 and

**14.** *Id.* at 559.

**15.** *George Hyman Constr. Co. v. United States,* 564 F.2d 939, 944, 215 Ct.Cl. 70 (1977); *Hegeman–Harris & Co. v. United States,* 440 F.2d 1009, 1011, 194 Ct.Cl. 574 (1971).

**16.** *See Gevyn Constr. Corp. v. United States,* 11 Cl.Ct. 203, 205 (1986), *aff'd,* 827 F.2d 752 (Fed. Cir.1987); *Laka Tool & Stamping Co. v. United States,* 7 Cl.Ct. 213, 216 (1984); *Shuey Aircraft, Inc. v. United States,* 3 Cl.Ct. 243, 245 (1983); *Raytheon Co. v. United States,* 2 Cl.Ct. 763, 767 (1983), *aff'd,* 730 F.2d 1470 (1984).

for 4 work days in 1979. The Board concluded that Phase III earthwork was delayed a total of 121 calendar days because of change orders, different site conditions, and unusually severe weather.[17]

Improper planning and incompetent workmanship was found to cause or to contribute substantially to delays in completing the Phase III work. The Board found, however, that differing site conditions and unusually severe weather in 1978 were sufficient to prevent completion of the earthwork by the end of summer 1978, even if the work had been done properly. The 97–day extension in the winter season between February 12, 1979, and May 20, 1979, granted by contract administration was viewed by the Board "as tantamount to no time extensions at all". To be meaningful, the Board concluded the time extension should be computed from June 1, 1979, when weather and soils conditions did not preclude earthwork. Accordingly, the Board allowed excusable delays from June 1, 1979, to September 29, 1979.

Plaintiff's "like-time" argument stems from its conception of the contractual significance of the CPM as a tool for monitoring and control purposes. The Board described this tool a follows:

11. The Critical Path Method (CPM) is a management technique by which a project can be broken down into a number of identifiable tasks or activities. These tasks are then sequentially interconnected, reflecting various interdependencies of the activities to provide an overall schedule to complete the project. The result of this scheduling process is a critical path through this schedule, which if postponed, will delay project completion. All other paths through the project schedule can experience some postponement because of acts of God, owner changes, or other factors without delaying the overall project completion. The amount of postponement which a path of activities can experience without delaying the completion of the project is called

"float". The more float a path of activities has, the longer it can be postponed without delaying project completion. Float is defined in the contract specifications as the difference between the early start and late start dates or between the early and late finish dates of any activities. The contract specifications further provide:

Float or slack is not time for the exclusive use or benefit of either the Government or the Contractor. Extensions of time for performance required under the Contract GENERAL PROVISIONS entitled "CHANGES", "DIFFERING SITE CONDITIONS", "TERMINATION FOR DEFAULT—DAMAGES FOR DELAY, TIME EXTENSIONS", or "SUSPENSION OF WORK" will be granted only to the extent that equitable time adjustments for the activity or activities affected exceed the total float or slack along the channels involved.

Pursuant to the CPM specification, plaintiff submitted the initial baseline CPM schedule on October 17, 1977; and the Navy on November 1, 1977, notified plaintiff of corrections needed for acceptance. These changes were incorporated and, as so adjusted, the October 17, 1977, schedule became the final approved "as-planned" CPM network. In the Board proceedings, plaintiff's delay/impact claims expert presented a revised "as-planned" schedule that he had adjusted for seasonal considerations, which produced a critical path that shifted from building construction to site and roadwork operations and projected a revised completion date of February 2, 1979 (10 calendar days earlier than the contract completion date of February 12, 1979). Plaintiff's expert further presented analyses of how owner-caused and weather related days affected his as-planned schedule adjusted for wet and dry season restraints to reach a conclusion that a CPM schedule as so adjusted would have a

---

17. Delays from change orders and work restrictions totaled 22 calendar days for work during 1977, differing site conditions accounted for 10 work days of excusable delay in 1978, and change orders accounted for a total of 19 calendar days excusable delay in 1979 (14 work days = 20 calendar days).

*projected* completion date of October 29, 1980. These analyses were considered by the Board, but were not accepted.

Plaintiff's "like-time" argument assumes that the final approved as-planned CPM network delineates procedures that are fixed and contractually binding without regard to actual operations on the project. The approved CPM network diagram is an administrative tool that is useful in organizing and directing work, reporting progress, and for requesting progress payments for work accomplished. Analyses made after project completion, however, that make adjustments to attain new and revised *projected* scheduling depend on theoretical contingencies. They are of limited value.

Plaintiff's delay/impact claims expert did not present a comparison of either the October 17, 1977, as-planned schedule, or his as-planned schedule adjusted for wet and dry season restraints, with actual activities on the project—the as-built schedule. The Board had before it the records that reflect actual field operations and was in a position to relate the as-built schedule to the expert's theoretically adjusted as-planned schedule.

Plaintiff's "like-time" analysis to attain a revised completion date, matches excusable delay to the as-planned work schedule and the time period in which the affected activity was delayed. Plaintiff points out that there were excusable delays in 1977, 1978 and 1979, and argues that all time extensions should be matched to the period during which the delays occurred and the particular earthwork activities affected.

In plaintiff's analysis of 1977 earthwork, the as-planned CPM schedule provides the Seg/Ren building site work would take from June 22, 1977, to September 16, 1977, and stage 1 roads (which could require 56 days to complete) would be worked on from September 15 to October 15, 1977. Plaintiff adds the 22 calendar days excusable delays allowed by the Board for changes and log-burning restrictions, to 6 days for unusually severe weather, to make total time extensions to earthwork for 1977 equal 28 days. These extensions were ap-

plied to the Seg/Ren as-planned schedule to produce a Seg/Ren grading completion date of October 14, 1977. This required all the stage 1 roadwork to be moved to a period beginning the next dry season, June 1, 1978, with a corresponding impact on the start of Phase III stage 2 roadwork.

The as-planned CPM schedule for 1978 earthwork provided stage 1 roads would be completed from June 1—October 15, 1978, and all earthwork and stage 2 roads would be completed during the June 1—October 15, 1978, period. Plaintiff would apply the 60 days for severe rainfall and the 14 days due to change orders and differing site conditions allowed by the Board, plus 6 days for a differing site condition that had been allowed in contract administration, (a total of 80 calendar days), to the 56 days on the as-planned schedule to complete stage 1 roads, to attain a total of 138 days (including 2 holidays) for stage 1 roads. If the stage 1 roads were begun June 1, 1978, the completion date would be October 16, 1978. All additional planned 1978 earthwork and grading for stage 2 roads accordingly would have to be deferred until the next dry season—June 1, 1979.

For 1979 earthwork and roadwork, plaintiff would apply 24 days allowed by the Board for weather and changes, plus 16 calendar days for the Board's alleged miscalculations on changes, for a total of 40 calendar days of allowable extensions in 1979. Plaintiff then adds to the 40 days the 210 calendar days in the as-planned schedule to complete the stage 2 roads, plus 5 holidays, for a total of 255 days for completion of stage 2 roadwork. These days are applied in the summer season beginning June 1, 1979, to derive a revised contract completion date of February 10, 1980. This calculation would require remission of all remaining liquidated damages assessed for the period September 29, 1979, to February 7, 1980.

Plaintiff's calculations in application of its "like-time" theory disregard the facts found by the Board as to the sequence of work, the quality of work, and the effects of weather on the Phase III work in the years 1977, 1978 and 1979. The calcula-

tions reflect a theoretical application to a CPM as-planned schedule that was not intended to be followed. The calculations disregard the facts that actually existed in on-site operations.

The Board resolved against plaintiff many factual contentions asserted by plaintiff and its subcontractor as to site conditions, normal weather conditions to be anticipated during performance, and actual conditions that occurred. The Board made specific findings on the prudence of the subcontractor's planned sequence of operations, the quality and quantity of its equipment and personnel, and its competence to perform the earthwork at the project site. The Board's findings of fact on these matters show that plaintiff is responsible for much of the delay in the project, and that the "like-time" theory is not applicable to any period other than 1979 work as recognized by the Board. The Board's findings of fact as to these matters are supported by substantial evidence in the record.

The principal earthwork and roadwork activities on the project, primarily, clearing, grubbing and grading, was subcontracted to Voudouris Construction Company (Voudouris). Voudouris was not experienced in earthwork in the project area; it had never performed earthwork in Western Washington before this project. Voudouris shut down its operation in mid-November 1978, and, because it could no longer financially continue, abandoned the subcontract.

The approved CPM as-planned schedule did not provide for seasonal restraints due to weather conditions. The Board found that, although plaintiff and Voudouris reasonably assumed that substantially all of the earthwork had to be performed between June 1 and October 15 because of weather and soil conditions at the site, plaintiff's "as-planned" CPM schedule indicated that Voudouris planned to perform a number of activities involving the moisture sensitive soils during the wet season, October 15, 1977, to May 31, 1978, including stripping top soil, grading roads and turnouts, grading building sites, and tank excavation.

The Board found that Voudouris commenced grading the Seg/Ren site on September 16, 1977, and continued through mid-October 1977. From October 6, 1977, to November 5, 1977, Voudouris was engaged in grading operations on Phase III, stage 1 roads—Freeman Street, County Road North and Craven Road.

With respect to plaintiff's contention that abnormal rainfall had an adverse effect on Voudouris' earthwork operations in 1977, the Board found that it was unable to conclude that either the earthwork and roadwork, or overall completion of Phase III, was delayed thereby. One of the reasons was that plaintiff's and Voudouris' testimony lacked credibility. Voudouris testified that rains in September, October, and November, 1977, caused his grading operation to be totally shut down from September 28 to October 3, on October 5 and 6, and from October 24 to November 2, 1977. The Board found that from September 28 to October 6 and from October 24 to November 2, Voudouris was engaged in burning and logging activity, and that on October 3, 5, 6, 24 and 31, 1977, according to plaintiff's records Voudouris' workers actually were engaged in grading activity at the Seg/Ren building site and on County Road. Further, plaintiff's CPM reports from March 15, 1978, through July 1978, stated that all Phase III buildings, roadwork and utilities were on or ahead of schedule.

Voudouris' lack of experience and incompetence is reflected in the Board's findings that improper equipment and procedures were used in the earthwork. The glacial till soils at the project site generally were slightly above optimum moisture content in their natural state and could be compacted to contract requirements in their natural, undisturbed state. An increase in the moisture content of the soils of more than 1 or 2 percent, however, would cause the upper several inches of undisturbed material to be uncompactable. Once compacted and sealed, the depth of penetration of rainfall would be minimal; continuous rain for several days would undo the compaction to some extent.

Proper earthwork practice required a contractor to perform a sustained operation in each area—that is, an orderly progression of clearing and grubbing, immediately followed by grading, crowning off the area so that water would run off, compaction with a smooth wheel roller, and, preferably, applying base course and paving; and, particularly, to ensure, prior to the winter rainy season, that surfaces were sealed and drainage ditches were provided where necessary. The Board found that Voudouris' planned use of a "sheeps foot" self-propelled compactor rather than a smooth wheel roller for compaction of soils was improper.

Throughout 1978 some soils at the project did not dry out from the rainfall of the winter season of 1977–78. The Board found that that condition resulted principally from Voudouris' fault in not properly protecting the soils from the winter weather in accordance with contract requirements and proper trade practice. If Voudouris and plaintiff had followed proper procedures for protecting the disturbed areas against the wet weather in the winter of 1977–78, the effect of that weather on its earthwork operations in spring and summer of 1978 would have been minimal.

The Board found that earthwork was totally rained out in the summer 1978 for a total of 30 days. To allow for drying out of soils, the Board multiplied by 2, and allowed 60 calendar days of excusable delay due to unusual weather conditions in 1978. Voudouris' inexperience or incompetence contributed substantially to the time lost after the period of abnormally high rainfall. The board specifically found that:

—Voudouris had equipment and crews adequate to do required earthwork under optimum conditions, but it did not have equipment and crews adequate for the work under conditions of normal rainfall as described in contract documents.

—Because of inadequate crews and equipment, plaintiff and Voudouris had scheduled critical, moisture sensitive earthwork between October 1978 and January 1979.

—Voudouris failed to grade, compact and seal areas which it had opened up and disturbed by clearing and grubbing, thereby allowing penetration of moisture from rainfall.

—Voudouris failed to crown or slope roads for surface run-off before leaving them overnight, and for longer periods.

—Voudouris failed to install required ditches and culverts to permit drainage of rain water.

—Voudouris failed to test lifts of fill for moisture content and compactability as required by the contract, and therefore many areas had to be recompacted;

—Voudouris improperly left berms on the sides of roads, thereby allowing ponding of water to occur.

Voudouris' substandard workmanship also impacted on claimed delays due to alleged differing site conditions encountered on East Road. The Board found that Voudouris, in violation of contract specifications, had placed at some locations fill material that had excessive fines and excessive moisture content. Corrective work had to be redone in September and October 1978 because of fault on Voudouris' part in installing material with excessive moisture and excessive fines, and in allowing water to pond by not properly grading, compacting, crowning and sealing the road surface.

In summary, the Board's conclusion to apply the 121 calendar days of excusable delay for Phase III earthwork and roadwork to the period commencing June 1, 1979, and ending September 29, 1979, on the facts of this case was an appropriate application of "like-time" methodology for determining the completion date. The "as-planned" CPM schedule as adjusted in plaintiff's argument has little resemblance to the facts of plaintiff's actual earthwork and roadwork operations.

*Acceleration Claim*

In administering the contract, the Navy allowed 97 days for excusable delay and extended the completion date to May 20, 1979. Plaintiff argues the time extension to February 10, 1980, under either its "like-time" theory, or to September 29, 1979, as determined by the Board, entitles it to

costs of accelerated effort in 1978 and 1979, because the Navy failed to issue the time extensions that properly were allowable for excusable delay. Plaintiff's earthwork and roadwork were not completed until December 4, 1979, and the project was not substantially completed until February 7, 1980. Plaintiff contends it is entitled to compensation for acceleration effort during 1978 and 1979 as a result of the Navy's failure to grant meaningful extensions for excusable delays in "like-time" periods. In addition, the Navy's failure to supply complete rainfall data is said to lead to a distorted view of normal conditions at the site, compromised planning for contract performance, and prevented plaintiff's compliance with its as-planned CPM schedule. Plaintiff's inability to maintain its construction schedule caused the Navy to pressure plaintiff and its surety to accelerated effort.

■ Where a contractor finishes the project within the contract time plus excusable delays, the refusal to issue time extensions properly allowable may be the basis for a claim for acceleration costs. In order for plaintiff to be successful in its acceleration claim based upon a failure to grant time extensions for excusable delays, three conditions must be established: (1) that any delays giving rise to the orders were excusable; (2) that the contractor was ordered to accelerate; and (3) that the contractor in fact accelerated performance and incurred extra costs.[18]

■ The record before the Board does not establish that items 1 and 3 of these requirements were satisfied. Plaintiff did not complete the work within the contract time plus the period for excusable delays. The Navy's application of the 97 days excusable delay to the February 12, 1979, contract completion date, even when found by the Board to be "tantamount to no time extension at all", does not establish that

the Navy required the work to be accelerated. Nor does the Board's determination to apply the time for excusable delays to a period commencing June 1, 1979, and ending September 29, 1979, establish that "like-time" should have been applied in 1977 and 1978.

The Board found on the record that throughout 1978 the Navy pressed plaintiff to take actions, including the employment of larger crews and more equipment, to accelerate earthwork progress on the project. Also, the Board found that the Navy contacted plaintiff's bonding company in efforts to apply pressure on plaintiff to accelerate.

■ The foregoing findings are sufficient to satisfy the requirement that an order to accelerate be present. An order to accelerate, for purposes of a claim, need not be couched in explicitly mandatory terms.[19] The Board found, however, that plaintiff did not in fact accelerate its earthwork efforts at all in 1978. Plaintiff and Voudouris attempted to obtain additional grading equipment in 1978 but were unsuccessful because of a shortage due to heavy construction and timber activities in the area. Plaintiff and Voudouris were unable to obtain qualified personnel so as to maintain double shifts, and in fact did not substantially increase the number of personnel performing earthwork in 1978. The record does not support plaintiff's contention that any significant expansion of man-hour effort was made by Voudouris during 1978 in response to Government pressures.

Plaintiff's new earthwork subcontractor in 1979 (Scalzo) did expand its earthwork forces and equipment. Scalzo flooded the area with men and equipment—employing twice as many dozers and front-end loaders as Voudouris had used, three times as many graders, scrapers, and water trucks, and four times as many compactors. In

---

**18.** The Board in its analysis utilized the five conditions stated in *Fermont Division, Dynamics Corporation of America*, ASBCA No. 15806, 75–1 BCA ¶.11,139 at 52,999–53,000. The Court of Claims in *Norair* observed that the two additional requirements—contractor request for extension of time and denial of the request—in effect

are equivalent to the requirement of an order to accelerate. *Norair Engineering Corp. v. United States*, 666 F.2d 546, 548, n. 5, 229 Ct.Cl. 160 (1981).

**19.** *Id.* at 550.

addition, Scalzo worked with eight dump-trucks whereas Voudouris had used none. Scalzo worked in many areas simultaneously at plaintiff's insistence.

The Board concluded Scalzo's acceleration at that time was necessary to correct the poor workmanship and make up the lost progress by Voudouris. The Board's conclusion that the pressures exerted by the Navy were justified as legitimate efforts to overcome periods of nonexcusable delays and meet its contract operations is based on facts that have substantial support in the record as a whole. Denial of plaintiff's acceleration claim was correct as a matter of law.

*Constructive Stop Order*

■ Before the Board, plaintiff contended that the grading operation on the Seg/Ren building site was delayed from August 2 to September 16, 1977, because the Navy was about to issue a change order, and that the change order (PC 9) was the major cause of delay of earthwork in 1977. PC 9 provided for the relocation of the parking area, the enlargement of an earth berm and the filling in of a ravine in connection with work in the Seg/Ren building. By letter dated August 30, 1977, plaintiff was directed to proceed with clearing and grubbing for PC 9 work, and by letter dated August 30, 1977, to proceed with all PC 9 work, including grading. Voudouris elected to defer grading the new parking lot until summer 1978. Contract administration on April 6, 1978, gave an equitable adjustment of $58,000 and a time extension of 14 calendar days for PC 9 work. On December 2, 1981, the contracting officer granted an additional $26,064 for PC 9 work.

The Board found that no stop work order was issued in connection with PC 9. There was no documentation in the contract files, and internal memoranda of the Navy indicating that between August 3–24, 1977, Voudouris was working in the Seg/Ren area. Further, on November 16, 1977, plaintiff's project manager informed the Navy that PC 9 would add 8 working days to the completion date. The Board conclud-

ed that the 14 day time extension fully compensated plaintiff for the time to perform the actual changed work in PC 9.

Plaintiff contends that the Board's conclusion is erroneous as a matter of law because it failed to recognize the case law relevant to a constructive suspension of work when a contractor is informed of an impending change order. Plaintiff argues that the Board's failure to comment on the possibility that a constructive suspension occurred demonstrates that the Board failed to consider the entire record and failed to properly consider and decide if plaintiff had been constructively suspended under standards identified in *Merritt–Chapman*.[20] In that case, the Court of Claims concluded the Board there had failed to consider separately the issue of the length of the suspension with the independent problems of whether the suspension caused loss or expense to the contractor.

The Court of Claims noted that the Suspension of Work Clause presented three issues: (1) whether there has been a suspension for the Government's convenience either total or partial, and either actual or constructive; if the answer is affirmative, then, separate issues to be resolved are (2) did the suspension delay the work for an unreasonable length of time; and, if so, (3) did this unreasonable delay cause additional expense or loss. The *Merritt–Chapman* case concerned a $16 million project to construct certain locks and dam in the navigational development of the Ohio River, and the administrative record concerned four decisions issued by the Board. On the record in that case, the Court of Claims concluded the Board had failed to disentangle the question of the existence of a suspension from the independent issue of what damage the suspension caused or could have caused. Plaintiff contends that, similarly, in this case, the Board's analysis fails to consider each element separately, and, instead, improperly rolls all the questions into one.

**20.** *Merritt–Chapman & Scott Corp. v. United* *States,* 439 F.2d 185, 192, 194 Ct.Cl. 461 (1971).

On the facts, the situation in this case is not comparable to the *Merritt–Chapman* claim. No evidence in the administrative record indicates that the Board improperly intermixed the issue of whether plaintiff's work was suspended, actually or constructively, with damage issues. The Board's findings establish that the notice that PC 9 was impending did not cause Voudouris to suspend work in reliance thereon.

The Board specifically found completion of Phase III was not delayed because of PC 9 for any period of time longer than the 14 calendar days allowed. By August 2 or 3, 1977, Voudouris had substantially completed all of the clearing and grubbing of the Seg/Ren site, and could have begun its grading operation in that area. The administrative record shows that during the period of alleged delay, Voudouris was continuously performing clearing and grubbing activities at the Seg/Ren site, Ziegemeir Street, the Truck Holding Yards, County Road, and East Road.

The Board found the conduct of Voudouris and plaintiff shows that neither construction of the Seg/Ren building nor completion of the overall project was delayed more than 14 calendar days by PC 9. Voudouris' diaries are silent concerning any further delay or impact because of PC 9. Neither Voudouris nor plaintiff informed the Navy of any such delay or impact while the work was proceeding. Look Ahead Reports by plaintiff during 1977 contained no allegation of delay arising out of PC 9, although such reports were required by the contract specification to include "delaying factors and their impact". In the Look Ahead Reports from March 15, 1978, through July 1978, plaintiff stated that all Phase III buildings, roadwork and utilities were "on or ahead of schedule."

The Board's findings are supported by substantial evidence. On the facts of this case, the Board had no reason to make a separate finding that a verbal notice in August 1977 that PC 9 soon would be issued caused Voudouris to suspend work as a result.

*Other Findings*

In addition to the three questions of mixed law and fact in the Board's findings, in its motion for summary judgment, plaintiff challenged as erroneous specific findings of fact related to the calculation of time extensions. In addition, plaintiff asserted the Board failed to make findings of fact relative to some claims for compensable delays and for direct costs. In these issues plaintiff seeks to reargue matters already considered by the Board.

All of the information relative to the conclusions plaintiff now asserts is in the administrative record. The Board's findings of fact on that information prevail in the absence of a showing they lack the support of substantial evidence. Defendant's motion papers, and defendant's contentions at oral argument address each of plaintiff's alleged erroneous findings by the Board.

Plaintiff may not, in a Wunderlich Act review, retry factual issues resolved by the Board at the administrative level. There has been no showing that the Board's findings of fact relative to those claims for additional time extensions and for other compensable delays are not supported by substantial evidence. Review of the administrative record, for the reasons identified by defendant, establish that they have such support.

*Conclusion*

On the basis of the foregoing, defendant's motion for summary judgment is ALLOWED; plaintiff's motion for summary judgment is DENIED. The Clerk is directed to dismiss the complaint. Defendant may recover its costs.