**GULF CONTRACTING, INC. and Hughes Masonry Co., Inc., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

No. 90–42C.

United States Claims Court.

June 28, 1991.

David B. Ratterman, Louisville, Ky., for plaintiffs. Stephen E. Smith and Gerald L. Stovall, Louisville, Ky., and George E. Duncan, Jr., Atlanta, Ga., of counsel.

Joan M. Bernott, Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson, for defendant. Anne W. Westbrook, U.S. Army Corps of Engineers, Savannah, Ga., of counsel.

## OPINION

MARGOLIS, Judge.

This government contracts case is before the court on cross-motions for summary judgment. Plaintiff contractor entered into a contract to construct buildings for the defendant. The contractor and its subcontractor claim compensation for delay, return of liquidated damages, and reimbursement of interest expenses on borrowings and expert consultant fees, allegedly caused by a change to the contract. The Armed Services Board of Contract Appeals ("ASBCA") in its first opinion agreed that there was a constructive change to the contract. In its second opinion, the ASBCA awarded direct costs resulting from the change, but denied the contractor's other claims for relief. In its third decision, the ASBCA denied the contractor's motion for reconsideration. The plaintiffs appeal the adverse decisions of the ASBCA under the Wunderlich Act, claiming that portions of the ASBCA's decisions should be reversed as arbitrary and capricious, not supported by substantial evidence, and based on errors of law. The defendant asserts that the ASBCA's decisions are supported by substantial evidence in the record and should not be disturbed. After careful review of the record, and after hearing oral argument, this court upholds the ASBCA's decisions, and accordingly denies the plaintiffs' motion for summary judgment and grants the defendant's motion for summary judgment.

## FACTS

Plaintiff Gulf Contracting Inc. ("Gulf") was awarded a $6,729,000 contract on May 19, 1975 for the construction of an enlisted men's barracks complex at Fort Gordon, Georgia ("the project"). Plaintiff Hughes Masonry Company, Inc. ("Hughes") was Gulf's masonry subcontractor for the project. The U.S. Army Corps of Engineers, Savannah District ("Corps") administered the project under Contract No. DACA21–75–C–0115.

The contract was scheduled to be performed between June 16, 1975 and November 7, 1976. The scheduled completion date was extended 195 days through contract modifications to May 21, 1977. Gulf finished the project 147 days beyond the extended contract completion date, completing the gymnasium on October 15, 1977. The government assessed and withheld $29,106 in liquidated damages as a reuslt of this delay in completion.

Gulf submitted a critical path network that sequenced the construction work for government approval. The approved schedule was intended to be used by Gulf to plan, organize and direct the work. Progress on the schedule, as updated during the project, was used to determine Gulf's progress payments. Gulf and the government updated the critical path schedule each month between August 1975 and May 1977. A final update was prepared on October 12, 1977, when the project was nearly complete. Major changes to the approved network during the course of the project, particularly those expected to affect contract completion dates, required written notification of the contracting officer.

Gulf's work on the barracks complex involved construction of seven barracks buildings and seven related support buildings including a gymnasium. As its overall scheme of sequencing work on the project, Gulf planned to prosecute work on the barracks as a group. Work on the support buildings was to take place concurrently and be prosecuted as a separate group. The original critical path schedule identi-

fied the support buildings as the critical path to completion of the project. The critical path remained in the support building construction throughout the project with the exception of a shift to barracks in December 1976 associated with a late start of prefabricated shower units.

In erecting the barracks, Gulf elected to lay large planks of pre-cast, pre-stressed concrete, called Quad–Ts, to form the second and third level barracks floors. To anchor the Quad–Ts, Gulf had to weld the Quad–T stems to imbeds in the exterior and interior masonry walls.

Gulf initially contemplated that it would weld the Quad–Ts to both the exterior and interior walls prior to pouring the concrete topping that served to level the floor surface. The Corps instead directed Gulf to weld the exterior ends, pour topping in the bedroom areas to load the Quad–Ts, allow the topping to cure, and then weld the remaining interior ends and pour topping on the corridor floor areas. This meant that Gulf had to weld and pour topping at two separate times, necessitating the recall of welding, masonry, and concrete work crews multiple times to the same work areas which disrupted its planned production sequence. Gulf needed to erect temporary forms to contain the concrete topping when it was poured in these separate areas, adding about 80 lineal feet of forming to the requirements for each "pod" of the barracks. Certain procedures became more difficult to perform. For example, the interior end welding had to be performed from the floor beneath rather than from above as originally contemplated.

In its first opinion in this case, the ASBCA considered the Quad–T issue and stated in its findings of fact that the government's Quad–T directive "caused some delays with regard to [Gulf's] work as well as the work performed by its masonry and erector subcontractors." *Gulf Contracting, Inc.*, ASBCA Nos. 27221 *et al.*, 84–2 B.C.A. (CCH) ¶ 17,472, at 87,065 (1984). The ASBCA found "that the Government's oral directive was the equivalent of a change order, that it caused [Gulf] to perform in a manner different than it had planned, and that to the extent [Gulf] incurred greater expense as a result, it is entitled to an equitable adjustment under the contract's 'Changes' clause." *Id.* at 87,066.

The Board remanded the Quad–T matter to the contracting officer "for further negotiation on the question of quantum." *Id.* at 87,068. Negotiations failed to resolve the question, and the parties returned to the ASBCA for resolution of the quantum issue. In its second opinion, the ASBCA acknowledged that the Quad–T directive resulted in additional direct costs and awarded $24,362 to Gulf for these costs. However, the ASBCA concluded that Gulf was not entitled to compensation for delay to the project, loss of efficiency, refund of the assessed liquidated damages, interest expense on borrowings, or expert consultant fees for a report prepared by Vinson & Associates. *Gulf Contracting, Inc.*, ASBCA Nos. 30195 *et al.*, 89–2 B.C.A. (CCH) ¶ 21,812 (1989). On Gulf's motion for reconsideration, the ASBCA affirmed its earlier decision denying Gulf compensation for items other than direct costs. *Gulf Contracting, Inc.*, ASBCA Nos. 30195 *et al.*, 90–1 B.C.A. (CCH) ¶ 22,393 (1989).

## STANDARD OF REVIEW

The ASBCA's adverse decisions were appealed by Gulf and Hughes to this court, invoking jurisdiction under 28 U.S.C. § 1491(a)(1), and review under the Wunderlich Act, 41 U.S.C. §§ 321, 322. In a Wunderlich Act case, this court "may not take new evidence or redetermine the facts, and limits its review to the record developed before the agency." *Titan Pacific Construction Corp. v. United States*, 17 Cl.Ct. 630, 632 (1989), *aff'd mem.*, 899 F.2d 1227 (Fed.Cir.1990). This court upholds a finding of fact by an agency board of contract appeals unless it is "fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." 41 U.S.C. § 321. Senior Judge Harkins in *Titan Pacific Construction* summarized the standard of review as follows:

The scope of judicial review is narrow, and is limited to whether there was substantial evidence—such evidence as might convince a reasonable man—to support the conclusion reached by the agency officials.

The entire administrative record is before the court, and the plaintiff has the burden of establishing the fact that the record does not support the Board's finding. It is not the court's function to cure plaintiff's deficiency "by an independent excursion along the administrative trail."

*Substantial* evidence is evidence which could convince an unprejudiced mind of the truth of the facts to which the evidence is directed. Evidence may be substantial even if it is the sole evidence in a case, *e.g.*, expert testimony. The amount of testimony, however, is not necessarily determinative, *e.g.*, if the only evidence is a series of isolated statements in the record.

Reasonable inferences fairly drawn from the evidence are for the administrative tribunal. Where two equally reasonable but contrary inferences might be drawn from the record, and each could be sustained as supported by substantial evidence, the one adopted by the Board should be sustained. Moreover, where conflicting testimony is in the record, the Board's preference will, generally, not be disturbed unless the court can conclude that the findings are not supported by some evidence which qualitatively and, in appropriate circumstances, quantitatively, can be deemed substantial evidence when the record is viewed as a whole.

In limited circumstances the court will decide an issue of fact not decided by the Board, or contrary to the finding made by the Board. Such action is not considered unless the court first concludes that there is no substantial evidence to support the Board's findings. The Board's findings may be supplemented when evidence on the fact question is undisputed, and a contrary finding may be made when the overwhelming weight of the evidence points to one conclusion of fact.

The substantial evidence rule requires consideration of both opposing evidence and evidence that supports the Board's findings. The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole. Where, however, the opposing evidence is *not* overwhelmingly in favor of the opposing view, the view of the facts adopted by the Board, if otherwise proper, will be sustained. If there is adequate and substantial evidence to support either of two contrary findings of fact, the one adopted by the Board is binding on the court, whatever its own evaluation of the evidence might be.

*Titan Pacific Construction*, 17 Cl.Ct. at 634–35 (citing & quoting *Koppers Co. v. United States*, 405 F.2d 554, 556–59, 186 Ct.Cl. 142, 148–51 (1968); other citations omitted).

■ Conclusions of law are not binding on this court. 41 U.S.C. § 322. However, a board's interpretation of a contract is entitled to careful consideration and accorded great respect. *See, e.g., Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985); *Raytheon Co. v. United States*, 2 Cl.Ct. 763, 767 (1983), *aff'd*, 730 F.2d 1470 (Fed.Cir.1984).

## DISCUSSION

In this court, Gulf and Hughes claim that the ASBCA's decisions denying compensation for delay, relief from liquidated damages, and allowance for interest expenses on borrowings and for expert consultant fees, allegedly resulting from the constructive change to the contract, should be reversed as arbitrary and capricious, not supported by substantial evidence, and based on errors of law.

*Compensable Delay*

■ The ASBCA found that delay of completion of the project was not caused by the Quad–T directive, but rather by factors within Gulf's purview. Rejecting the analysis of Gulf's expert witness, the

ASBCA relied upon the critical path schedule used during the project and upon the government's expert witness, Ockman in reaching this finding. The Board concluded that Gulf "failed to prove that the additional time required for the welding change exceeded the 'float or slack along the channels involved' so that a compensable time extension is due." Under the Wunderlich Act standard of review, the ASBCA's reliance on the critical path schedule used during the project and the government expert's analysis had substantial basis in fact. Consequently, this court upholds the ASBCA findings with regard to compensable delay.

*Expert Witnesses*

As the trier of fact, the ASBCA was able to judge the demeanor and credibility of the expert witnesses and to weigh their testimony. The ASBCA rejected the analysis of Gulf's expert witness, Vinson, upon which Gulf relied, as "totally unreliable" and "inherently biased."[1] Instead, the Board chose to believe the government's expert, Ockman, who performed a similar analysis with quite different conclusions. Vinson's report, according to the Board, lacked clarity and jumped from one unsupported conclusion to another. The ASBCA's rejection of the Vinson analysis also stemmed from its determination that Vinson's experience was deficient, particularly due to his lack of formal engineering college courses.

"This reviewing court must accept the Board's evaluation of conflicting conclusions of expert witnesses, unless the testimony is inherently improbable or discredited by uncontrovertible evidence." *Maitland Bros. Co. v. United States*, 20 Cl.Ct. 53, 64 (1990). This court upholds the ASBCA's finding that the analysis of Gulf's expert witness, Vinson, was unreliable.

Several factors impair the credibility of Vinson's analysis. Most importantly, the Vinson report is unpersuasive in establishing the quantum of delay and added costs arising from this contract change. In addition, although Vinson's analysis purports to separate government-responsible delays from contractor-responsible delays, it fails to assign values to contractor-responsible delays. In particular, Vinson's treatment of contractor-responsible disruptions to barracks work is not persuasively addressed by either his testimony or the Vinson & Associates report.

Thus, this court finds substantial evidence in the record to support the ASBCA's conclusion that the Vinson analysis is unreliable. This conclusion, as well as derivative conclusions, will not be disturbed.

*Critical Path Schedule*

There is substantial evidence in the record for the ASBCA's finding that the Quad–T directive did not affect the critical path of the project and consequently did not cause delay in the completion of the project.[2] It is clear that the Quad–T directive disrupted the planned work sequence. However, the plaintiffs fail to demonstrate a causal link between this disruption and the extension of the contract completion date. The testimony established that the barracks work items were not, but for one brief exception, formally on the critical path to project completion. The last building completed was the gymnasium, not a barracks building affected by the Quad–T directive.

The plaintiffs assert that the ASBCA erred in relying on an "inaccurate" critical path schedule to determine activity relationships and durations. However, the critical path schedule is the most logical evidence to consult in evaluating Gulf's progress and plan for the project. The critical path schedule was created and approved in contemplation of contract per-

---

1. As the trier of fact, the ASBCA is not bound by expert testimony. *See Southwest Marine, Inc. San Pedro Division*, ASBCA No. 28196, 86–2 B.C.A. (CCH) ¶ 19,005, at 95,980 (1986); *U.S. Engineering Co.*, ASBCA No. 28835, 84–2 B.C.A. (CCH) ¶ 17,305, at 86,241 (1984).

2. The project can be represented by a network of discrete paths that sequence interdependent tasks or milestones leading to project completion. The critical path, the longest path at any point in time, determines the project's expected completion date.

formance, and was updated regularly throughout the relevant performance period. The government and contractor consulted the critical path schedule in assessing Gulf's progress and providing progress payments. In addition, both Vinson and Ockman used the critical path schedule as the point of departure for their respective analyses. By contrast, "[a]nalyses made after project completion ... that make adjustments to attain new and revised *projected* scheduling depend on theoretical contingencies. They are of limited value." *Titan Pacific Construction,* 17 Cl.Ct. at 637 (emphasis in original).

### Estimate of Barracks Delay

The ASBCA found that the original claim estimate of 44 days of delay associated with added work and disruption caused by the directive was a fair evaluation of the additional time to complete the Quad–T change (8 additional days to complete each "B" barracks and 4 additional days to complete each "A" barracks). The ASBCA adopted the Ockman estimate of 70 days, even more generous than Gulf's initial estimate (10 days for each barracks). The Board rejected Vinson's estimate of 32 days per barracks, after considering Vinson's testimony and Ockman's testimony. Relying on the Ockman analysis of critical path progression, the ASBCA found that the delay caused by added work associated with the Quad–T directive did not affect the project completion date.

This court has carefully "canvassed the entire ASBCA record." *Maitland Bros.,* 20 Cl.Ct. at 60. Viewed as a whole, the record supports the ASBCA's factual findings that delay to the overall project was caused not by the Quad–T directive, but by Gulf's assignment of priorities in completing the work, conflicts and interference between Gulf and Hughes, and deficiencies in Hughes' quality control and workman-

ship. "A contractor typically may not recover if government-caused delay is concurrent with additional delay not caused by the Government, such as weather or contractor delay." *Wilner Construction Co. v. United States,* 23 Cl.Ct. 241, 245 (1991).

> The general rule is that '[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party.' Courts will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government.

*Id.* (quoting *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984); other citations omitted).[3]

### Liquidated Damages

■ This court agrees with the ASBCA that the critical path schedule, as a document required by the contract, represented a fair reflection of actual work accomplished. Neither the critical path schedule nor the government's analysis reasonably relied on by the Board showed that barracks work controlled completion of the project. Gulf and Hughes fail to present overwhelming evidence to the contrary. Consequently, this court agrees with the ASBCA that the government's assessment of liquidated damages was appropriate.

### Interest on Borrowings

■ Armed Services Procurement Regulation (ASPR) § 15–205.17 provided that "interest on borrowings ... costs of financing and refinancing operations ... are unallowable." The ASBCA concluded that the provision disallows the plaintiffs' claim for interest on borrowings, and cited as support earlier ASBCA decisions which applied ASPR § 15–205.17 to deny recovery of interest on borrowings. Gulf and

---

3. Gulf cites *J.D. Hedin Construction Co. v. United States,* 171 Ct.Cl. 70, 347 F.2d 235 (1965), for the proposition that the government must affirmatively establish concurrent delay on the part of the plaintiff. *Hedin* is distinguishable because in that case, "[t]he grant of an extension of time by the contracting officer carrie[d] with it the administrative determination (admission) that the delays resulted through no fault of the contractor." *Id.* at 83, 347 F.2d at 245. Here, there was no grant of overall contract delay that could be construed as an admission by the government of any delay associated with the Quad–T directive.

Hughes claim that the ASBCA erred as a matter of law in concluding that the contractor was not entitled to be reimbursed for interest costs on incurred borrowings required to finance extra labor and equipment necessitated by the Quad–T modification. The plaintiffs contend that the ASBCA's interpretation of ASPR § 15–205.17 is strained, that the unallowable costs that the drafters meant to avoid were general business costs incurred in attracting capital investment to fund a business venture, and that the ASBCA's interpretation would contradict the spirit of ASPR and the Fifth Amendment of the United States Constitution. Gulf and Hughes also assert that earlier ASBCA decisions supporting the ASBCA's denial were not reviewed by the Claims Court, and therefore are not binding precedent in this court.

Although conclusions of law are not binding on this court, 41 U.S.C. § 322, a board's interpretation of a contract is entitled to careful consideration and accorded great respect. *See Fortec Constructors,* 760 F.2d at 1291; *Raytheon,* 2 Cl.Ct. at 767. This court has reviewed the ASBCA decisions on this subject, and concludes that ASPR § 15–205.17 applies in our case and precludes the recovery of interest on borrowings by Gulf and Hughes. *See E.L. David Construction Co., Inc.,* ASBCA Nos. 29225 *et al.,* 89–3 B.C.A. (CCH) ¶ 22,-140, at 111,436 (1989) (citing *International Equipment Services, Inc.,* ASBCA Nos. 21104 *et al.,* 83–2 B.C.A. (CCH) ¶ 16,675, at 82,925 (1983)); *C.N. Flagg & Co.,* ASBCA Nos. 26444 *et al.,* 84–1 B.C.A. (CCH) ¶ 17,-120, at 85,267 (1983) (citing *Creative Electric, Inc.,* ASBCA No. 26368, 83–1 B.C.A. (CCH) ¶ 16,363, at 81,324 (1983); *Systems & Computer Information, Inc.,* ASBCA No. 18458, 78–1 B.C.A. (CCH) ¶ 12,946, at 63,122–28 (1977); *R.L. Spencer Construction Co., Inc.,* ASBCA No. 18450, 75–2 B.C.A. (CCH) ¶ 11,604, at 55,424 (1975)).

■ However, Gulf and Hughes also argue that Claims Court precedent allows a contractor to recover interest on borrowings as a direct cost made necessary by a government-ordered change.[4] *See, e.g., Bell v. United States,* 186 Ct.Cl. 189, 205–06, 404 F.2d 975, 984 (1968). Under this precedent, as stated by the United States Court of Appeals for the Federal Circuit, "[t]he changed work either must be traced to a specific loan or a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the government." *Gevyn Construction Corp. v. United States,* 827 F.2d 752, 754 (Fed.Cir.1987) (citing *Dravo Corp. v. United States,* 219 Ct.Cl. 416, 427, 594 F.2d 842, 847 (1979); *Singer Company v. United States,* 215 Ct.Cl. 281, 321–22, 568 F.2d 695, 718–19 (1977)). The contractor must prove the linkage between the changed work and the borrowings. *Dravo,* 219 Ct.Cl. at 428, 594 F.2d at 848 (citing *Singer,* 215 Ct.Cl. at 323–25, 568 F.2d at 719–20). Gulf and Hughes fail to meet this burden. Affidavits attached to their motion for summary judgment do not tie specific loans to changed work or delay. While the affidavit of Robert L. Ward, Jr., who was comptroller of Hughes during contract performance, does show borrowing around the time of the Quad–T directive, it does not prove that there was a necessity for this borrowing caused by the government-ordered change. "A mere showing of a history of business borrowings and a course of dealings with various banks during the time frame at issue is insufficient to prove a claim for interest." *Id.* at 429, 594 F.2d at 849 (citing *Singer,* 215 Ct.Cl. at 321–23, 568 F.2d at 718–19). Consequently, Gulf and Hughes are unable to recover interest on borrowings, and the ASBCA's determination is upheld.[5]

---

**4.** These cases do not involve a provision such as ASPR § 15–205.17 precluding recovery of interest on borrowings, and therefore are not binding in our case. For purposes of this discussion, the court will assume that these cases are applicable to the recovery of interest on borrowings in our case.

**5.** The plaintiffs also assert that prohibiting the award of interest on borrowings contradicts the spirit of the ASPR and the Fifth Amendment of the United States Constitution. However, the award of interest against the federal government is generally prohibited except where allowed by contract or statute. 28 U.S.C. § 2516(a). "'[T]he immunity of the United

*Expert Consultant Fees for Report*

■ Gulf claims that the ASBCA erred as a matter of law in denying $87,663.85 for professional consulting fees associated with Gulf's estimate of costs for the Quad–T modification. Gulf asserts that under provisions of the contract and ASPR § 15–205.31(a), whenever a contract change requires modification and updating of network diagrams and machine printouts for settlement of price or time adjustments by the government, the costs of professional and consultant services used in preparing the required modifications and updates are recoverable by the contractor. Gulf alleges that the government refused to negotiate unless the contractors determined the impact of the constructive change by updating the critical path network diagram and printouts. Without in-house resources to complete the task, Gulf hired Vinson & Associates to perform this work. Gulf maintains that the claimed amount of $87,663.85 does not include costs incurred by Gulf in preparation of its claim or for trial. Although the ASBCA found that the costs incurred by Gulf were claim preparation costs, Gulf argues in this court that there was no basis for the ASBCA's conclusion.

Contrary to Gulf's assertions, the conclusion that the fees are not recoverable is amply supported by the ASBCA's findings of fact. The Board stated that it issued an order "requiring Gulf to furnish Government counsel and the Board with a detailed statement, showing '(a) all of the items and figures which appellant intends to prove from books of account or other records; and (b) all the items and figures which appellant intends to prove by other means.' " The Board found that "Gulf chose to submit the Vinson report to satisfy the Board's order ..." and that "... Vinson testified as Gulf's expert, and relied almost exclusively on his report...." Gulf and Hughes do not effectively dispute these findings. ASPR § 15–205.31(d) provided that "[c]osts of ... consulting servic-

es ... incurred in connection with ... the prosecution of claims against the government, are unallowable."

Gulf seeks to recover claim preparation costs by asserting that they were incident to contract performance. *Singer*, 215 Ct. Cl. at 327–28, 568 F.2d at 721. *Singer* stands for the proposition that administrative costs of this nature are related to contract performance only if they benefit contract production or contract administration related to ongoing productive work. *Id.* These expenses were incurred entirely after completion of construction; they bear no relation to production or administration of an ongoing contract and must be disallowed. *See id.; Wilner,* 23 Cl.Ct. at 261.

Earlier ASBCA decisions are in accord. *See, e.g., G.A. Karnavas Painting Co.,* ASBCA No. 22281, 78–2 B.C.A. (CCH) ¶ 13,312, at 65,110 (1978); *G.W. Galloway Co.,* ASBCA Nos. 17436 *et al.,* 77–2 B.C.A. (CCH) ¶ 12,640, at 61,295 (1977). Consequently, this court upholds the ASBCA's determination that the $87,663.85 paid to Vinson is not recoverable by Gulf.

## CONCLUSION

The ASBCA's findings of fact are supported by substantial evidence in the record, and the ASBCA's conclusions of law are correct. This court upholds the decisions of the ASBCA. The plaintiffs' motion for summary judgment is denied, and the defendant's motion for summary judgment is granted. The plaintiffs' complaint is dismissed. The clerk is directed to enter judgment accordingly. No costs.

States from liability for interest is not to be waived by policy arguments of this nature. Courts lack the power to award interest against the United States on the basis of what they think is or is not sound policy.' " *Library of Congress*

*v. Shaw,* 478 U.S. 310, 321, 106 S.Ct. 2957, 2965, 92 L.Ed.2d 250 (1986) (quoting *United States v. N.Y. Rayon Importing Co.,* 329 U.S. 654, 663, 67 S.Ct. 601, 606, 91 L.Ed. 577 (1947)).